ZVANOVICH, APPELLANT, *v.* GAGNON & CO., RESPONDENT.

(No. 3,085.)

(Submitted February 17, 1912.   Decided March 5, 1912.)

[122 Pac. 272.]

*Personal   Injuries—Master   and   Servant—Evidence—Insufficiency—Nonsuit—Appeal and Error—Offer of Proof.*

Appeal and Error—Harmless Error—Striking Out Evidence.
  1.   It was not reversible error to strike out testimony of a witness, where there was other testimony of the same witness to practically the same effect.

Same—Presentation Below—Offer of Proof.
  2.   Where one desires to preserve for review a ruling which sustains an objection to a question, he must show by an offer of proof what the answer would be.

Negligence—Actions—Issues.
  3.   The issue of negligence or contributory negligence is for the jury when a fairly disputed question; but if the evidence is perfectly clear, it is for the court to decide.

Master and Servant—Personal Injuries—Action—Evidence—Sufficiency.
  4.   In an employee's action for personal injuries, received from falling into an open shaft in a building under construction, evidence *held* to sustain a finding that the plaintiff was guilty of contributory negligence which was responsible for his injury.

*Appeal from District Court, Lewis and Clark County; J. M. Clements, Judge.*

ACTION by Charles Zvanovich against Gagnon & Co.   From a judgment of nonsuit, plaintiff appeals.   Affirmed.

*Messrs. C. A. Spaulding,* and *Homer G. Murphy,* for Appellant, submitted a brief, and one in reply to that of Respondent; *Mr. Spaulding* argued the cause orally.

*Messrs. Kremer, Sanders & Kremer* submitted a brief in behalf of Respondent; *Mr. Louis P. Sanders* argued the cause orally.

MR. JUSTICE SMITH delivered the opinion of the court.

On the twenty-eighth day of November, 1910, the defendant corporation was engaged in the construction of the new wings,

or additions, to the state capitol building at Helena, and plaintiff was in its employ as a laborer or "boom" man; his duties being to shift and guide the boom of a large derrick used in hoisting building materials from the ground to different places on the building.  He charges that, in disregard of its duty to use ordinary care to furnish him a reasonably safe place in which to work, it carelessly left an open shaft in the building unguarded, and, while passing through the building for the purpose of seeking a place to urinate, as he had been tacitly invited to do by the defendant by its failure to erect a toilet-house at or near the place where he was working, he fell into the unguarded shaft, and was injured.  The defendant denied any negligence on its part, and interposed as affirmative defenses (a) that plaintiff fell into the shaft through his own carelessness; and (b) that he knew of the condition of the building and situation of the shaft and assumed the risks incident thereto. At the close of plaintiff's case, the defendant moved for a nonsuit on the grounds, among others, that his evidence showed, as a matter of law, that he was guilty of contributory negligence and assumed the risk.  The motion was granted, and judgment entered for the defendant.  Plaintiff appeals.

Plaintiff testified: "I am thirty-two years old.  I was working for Gagnon & Co. a couple of months before I got hurt, working on the derrick all the time.  It was the custom of the men when they urinate to go any place they can find, so that nobody can see them.  I seen the men and the boys and the superintendent do that.  They see us a good many times, and everybody knows that and don't stop us.  The main toilet on the ground floor of the capitol building was away over to the back door, and you have got to go into the building.  I didn't go into the main toilet on the morning I was hurt, because I was awful busy, and I cannot hold my water no more.  I was working close to the door where I went in; so I walked in, rushed in, and I walked right in the door.  The door was closed; then I walked right in and walked right straight that way and turned on my right; then I walked a couple of steps; and then I stepped

right into the hole and fell down. There was nothing guarding three sides of the shaft: I had been in this building prior to November 28, but had never been in this particular part. I never knew anything about the hole. When I went in, two carpenters were working in there, and the door was wide open. I stepped about two steps from the door, and the third one I walked right into it. I have been working about buildings most of the time for the last twelve years, and I knew how buildings were constructed. I had been working on the north side of the west wing for some time, anyway. I never urinated in the new building only that time when I fell down. I was working about seventy feet from the rear door of the old building. Whenever I wanted to answer a call of nature, other than urinating, I had frequently been back to the toilet in the capitol building; the men used the toilet for that purpose. I knew, before my injury, that I had a right to go there, if I wanted to. My duties required me to be on the outside most of the time. When I was working on the other side, we used to go behind a rockpile to urinate. I said I urinated once before in the building on the left-hand side, not on the inside. I never went in there before in that building. As to whether I ever urinated on the inside of the wings before I was hurt, well, I was once in there before, in the west wing. I was working there for a couple of months, and only urinated on the inside of the building once before the time when I was hurt. That time I went into the west wing through the door. I urinated on the east side. I went straight out, away on the other side, close to the window; then I would turn right back and walk right out again. I went in the same door. I didn't go in the same way, because it just happened that way. I went there to urinate on the morning, just because it was the nearest place to go, for one thing; and another thing, I was awfully busy, too busy to leave the place where we were hoisting a big stone. Question by Counsel: What have you to say as to whether the buildings you ever worked on had shafts open like this, and as to whether they were guarded or not? Mr. Sanders: Objected to as incompetent,

irrelevant, and immaterial, and not within any of the issues raised by the pleadings. Court: Objection sustained. (Exception by plaintiff.)'' Plaintiff continuing: ''The door of the main capitol building under the stairway must be 150 feet from where I was working on the outside, and the door I went into was maybe twenty to thirty feet. It was between ten and eleven o'clock in the morning when I got hurt. There wasn't any window at the place I fell down. There was a window just across from that door; there was another window on the other side, over twenty feet away. There is room there about twenty feet square; but it was dark in there. On the side where the hole was it was absolutely dark; you couldn't see anything; it was just as dark as midnight. I went in there on another occasion to urinate and turned to the left. I went straight back across that time, because I was close to the light, close to the window on the south side. On this occasion, instead of going straight that way, I just happened that way to turn to my right, and I fell into the hole. The window was not in the same condition the first time as the second time; it was very light in there the first time. I just went straight ahead. I never noticed and never looked on that side; that is the reason I never saw the hole. I know the light was all around that 20x20. If I had gone straight ahead, the day I went in there, toward the light, I would have been all right. I didn't do that, because this was the soonest way to go. I was going just behind the door to get through with my business, and go right out and attend to my work again, and I went in there in the dark, instead of going where it was light. When I first went in there, the window hadn't been boarded up, and nothing left but a pane of glass in the center. I tried to get in behind the door to urinate. I mean, I got in front of the door. I went in fast; I was in a hurry and rushed right in there. I was walking fast. I opened the door and walked right in fast, and kept on walking fast, and down I went.''

Oscar Hanson testified: ''The shaft had been open since June. There were several 4x4 stuck up on it, about eighteen inches

or two feet apart. A man would have to go between them on November 28 to get into the shaft. I don't think he would have to squeeze between them in order to fall in. These uprights would be removed in course of construction; they were put there to support the concrete floor above in the course of construction of the building. Partition tilings were to be installed in their place. This was a shaft for an elevator.''

1. It is contended that the court erred in striking out the testimony of the plaintiff, heretofore quoted, to the effect that [1] he saw men and boys and the superintendent urinate in the building, and ''everybody knows that and don't stop us.'' No reversible error can be predicated upon the ruling. The witness was allowed to testify that he saw the superintendent and his coemployees urinate in the building. This testimony was practically the same as that stricken out. The expressed theory of the trial court was that, so long as the evidence failed to disclose any objection thereto on the part of those in charge of the work of construction, it would be presumed that plaintiff and his coemployees were permitted to urinate ''wherever they pleased.'' This theory was in favor of the plaintiff, and we shall assume that it was correct; that is to say, we shall assume that he was acting within the scope of his employment when he was injured.

2. It is contended that the court erred in sustaining an objection to the question propounded to the plaintiff ''whether the buildings he ever worked on had shafts open like this, and whether they were guarded or not.'' It was the duty of the [2] appellant to make the record show prejudicial error. We have no means of knowing what the answer to the interrogatory would have been. If he had answered that all buildings he ever worked on had open, unguarded elevator shafts, like the one in question, the answer would have availed him nothing; in fact, it would have been to his prejudice. An offer of proof should have been made. In the absence of such offer, no prejudice is disclosed. (*State* v. *Byrd*, 41 Mont. 585, 111 Pac. 407; *Tague* v. *John Caplice Co.*, 28 Mont. 51, 72 Pac. 297.)

3. We think the plaintiff was properly nonsuited, for the reason, as disclosed by his own testimony, that he was guilty of contributory negligence. We shall assume, without analyzing the testimony on that point, that the act of the defendant in leaving the elevator shaft unguarded was negligence. The rule [3] is that, if the issue of negligence or contributory negligence is a fairly disputed question of fact, it must be resolved by the jury; but if the evidence is perfectly clear, it is for the court. (*Wall* v. *Helena St. Ry. Co.*, 12 Mont. 44–61, 29 Pac. 721.) We think this evidence is so clear and convincing that reasonable men of fair and unbiased minds cannot differ as to its effect. The plaintiff was employed on the outside of the [4] building; a toilet had been reserved for his use about 150 feet distant; he had used it on different occasions during the two months of his employment; once he had entered the west wing through the north door, the same door that he used on the day of his injury, for the purpose of urinating. On that occasion, he passed directly across the corridor, a distance of about twenty feet, to a lighted place on the south side of the wing. On the morning of the day in question, he left his work on the outside, opened the door, "walked right straight that way," and then, instead of continuing across the corridor to the lighted portion of the building, a distance of, perhaps, eighteen feet, excluding the steps he had already taken, he turned abruptly to the right, without "noticing and never looking on that side, toward a spot which was as dark as midnight," and fell into the elevator shaft. No negligence is predicated upon the action of the defendant in maintaining the shaft at the point in question. It was properly located there. But the plaintiff maintains that it was unguarded. Even so, his own negligent conduct was a proximate cause of his injury. He hurriedly left his work, rushed into the building, advancing toward a spot which was sufficiently lighted to enable carpenters to work there, and which he had used before, abruptly turned at right angles toward a portion of the building with which he was altogether unfamiliar, and into which he could not see on account of the

intense darkness, and fell into the shaft, all "because it just happened that way." He was thirty-two years old and had had twelve years' experience about the construction of buildings. His testimony shows that he is bright and alert mentally, and, with his experience, he must have known that he was liable to injury in rushing into dark portions of a building in course of construction of the magnitude of the west wing of the capitol. He knew that the light "was all around that 20x20," and if he had gone straight ahead he "would have been all right." He did not do that, "because this was the soonest way to go." He was "just going behind the door, and so went in there in the dark, instead of going where it was light." He "went in fast"; he was in a hurry, and "rushed right in there, and kept on walking fast," and "down he went." In other words, he voluntarily chose a method of procedure which might, and did, result to his injury in preference to a perfectly safe one, which he had previously employed under substantially the same circumstances. His course was clearly and manifestly negligent, and he is himself responsible for the injuries resulting therefrom. The situation disclosed no emergency which would tend to distract his attention or confuse his mind, or in any way justify his rash conduct.

In the case of *Massey* v. *Seller,* 45 Or. 267, 77 Pac. 397, it appeared that the plaintiff fell into an unguarded elevator shaft. Mr. Justice Wolverton said for the court, in commenting upon the conduct of the plaintiff: "Now, if it was so dark in there that he could 'see nothing,' it was certainly an act of folly on his part to enter on a cruise of exploration and discovery, without stopping to determine whether it was safe to proceed. To bolt headlong into a place little known, and where the senses cannot take note of it, is not the act of a prudent man, and there is no chance for any other inference or deduction concerning it. Reasonable minds could not come to any other conclusion touching it, so that there is nothing for the jury to determine, and the trial court very properly declared the result, as a matter of law." (See *Johnson* v. *Maiette,* 34 Mont. 477, 87 Pac. 447; *Mc-*

*Cann* v. *Atlantic Mills,* 20 R. I. 566, 40 Atl. 500; *Piper* v. *Cambria Iron Co.,* 78 Md. 249, 27 Atl. 939; *Geis* v. *Tennessee, C. I. & R. Co.,* 143 Ala. 299, 39 South. 301; *Bridger* v. *Gresham,* 111 Ga. 814, 35 S. E. 677; *Hilsenbeck* v. *Guhring,* 131 N. Y. 674, 30 N. E. 580; *Gillespie* v. *John W. Ferguson Co.,* 78 N. J. L. 470, 74 Atl. 460; see, also, *Meehan* v. *Great Northern Ry. Co.,* 43 Mont. 72, 114 Pac. 781, and *Molt* v. *Northern Pac. Ry. Co.,* 44 Mont. 471, 120 Pac. 809.)

The judgment is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.