PAGE, ADMX., RESPONDENT, *v.* NEW YORK REALTY CO., APPELLANT.

(No. 4,294.)

(Submitted January 14, 1921. Decided March 8, 1921.)

[196 Pac. 871.]

*Personal Injuries—Master and Servant—Workmen's Compensation Act—Construction—Ejusdem Generis Doctrine—Electric Passenger Elevator Operators—Contributory Negligence —Proximate Cause—Burden of Proof.*

Personal Injuries—Workmen's Compensation Act—Construction—Electric Passenger Elevator Operators—Nonhazardous Employment.
  1. *Held,* that the operation of an electric passenger elevator is not a hazardous employment within the provisions of the Workmen's Compensation Act (Chap. 96, Laws 1915).

Statutory Construction—Liberal Interpretation—Extent of Legislative Direction.
  2. The legislative direction contained in section 24 (a) of the Act above, that courts called upon to interpret its provisions must construe it liberally, is not a warrant for inserting that which has been omitted.

Workmen's Compensation Act—Construction—To What Occupations Applicable—*Ejusdem Generis* Doctrine.
  3. Under the rule of statutory construction that where general words follow an enumeration of particular subjects, they must be held to include only such objects or things as are of the same general character of those specifically mentioned, the provision of section 5 of the Workmen's Compensation Act making it applicable to any hazardous occupations, other than those enumerated, which might thereafter arise, *held* to apply only to such employments or industries as are of the same nature as those specifically mentioned in the Act.

Statutes Prescribing New Right and Remedy—Strict Construction.
  4. Under the doctrine of *expressio unius est exclusio alterius,* a statute prescribing a new right and a particular remedy must be strictly construed and followed.

Workmen's Compensation Act—Occupations Include—Question of Law.
  5. The question as to what persons or accidents come within the

---

1. For authorities discussing the question as to what occupations the Workmen's Compensation Acts are applicable to, see notes in **Ann. Cas.** 1913C, 28; **Ann. Cas.** 1916B, 793; **Ann. Cas.** 1918B, 704; **L. R. A.** 1916A, 216.
  On construction and effect of Workmen's Compensation Acts generally, see notes in **L. R. A.** 1916A, 23; **L. R. A.** 1917D, 89.
  3. Rule of *ejusdem generis* as applied to Workmen's Compensation Act, see note in **Ann. Cas.** 1917D, 7, 38, 39.

provisions of the Workmen's Compensation Act is one of law rather than one of fact.

Personal Injuries—Contributory Negligence—What Constitutes.

6. An elevator operator who had left the cage on the ground floor of the building, to go upon the street, and, rushing back, opened the door and, without looking to see whether the cage was where he had left it, jumped in and fell into the shaft, was, as a matter of law, guilty of contributory negligence proximately causing his death.

Same—Proximate Cause—Burden of Proof.

7. In a personal injury action, the burden is upon plaintiff to prove by a preponderance of the evidence that the negligence of the defendant was the proximate cause of the injury.

*Appeals from District Court, Silver Bow County in the Second Judicial District; George B. Winston, Judge of the Third District, Presiding.*

ACTION by Catherine Page, as administratrix of Clinton Page, deceased, against the New York Realty Company. From a judgment for plaintiff and an order denying a new trial, defendant appeals. Reversed, with directions.

*Mr. A. C. Hopkins* and *Messrs. Frank & Gaines,* for Appellant, submitted a brief and argued the cause orally.

The occupation of the appellant is not a hazardous one. (*Guerrieri* v. *Industrial Insurance Com.,* 84 Wash. 267, 146 Pac. 608; *Remsnider* v. *Union Savings & Trust Co.,* 89 Wash. 87, Ann. Cas. 1917D, 40, 154 Pac. 135; *Wilson* v. *Dorflinger & Sons,* 218 N. Y. 84, Ann. Cas. 1917D, 38, 112 N. E. 567; *Chappelle* v. *412 Broadway Co.,* 155 N. Y. Supp. 858, 218 N. Y. 632, 112 N. E. 569; *Sheridan* v. *P. J. Groll Construction Co.,* 155 N. Y. Supp. 859, 218 N. Y. 633, 112 N. E. 568.)

In the case of *Aylesworth* v. *Phoenix Cheese Co.,* 170 App. Div. 64, 155 N. Y. Supp. 916, the claimant was engaged in the occupation of harvesting ice. There was no specific mention of harvesting ice in the list of hazardous occupations. It was suggested that he was entitled to compensation because of a group of hazardous occupations in the New York Compensation Act which included the preparation of "fruit, vegetables, fish and foodstuffs." The New York court, though assuming

that plaintiff's employer was engaged in the business of preparation of food stuffs, called attention to the fact that the claimant was employed for a specific purpose, *i. e.,* harvesting ice, and said: "He was at work at his regular employment of harvesting ice, and under well-established rules of construction the language of the Workmen's Compensation Act found in group 33 of section 2 cannot be stretched to cover this case. First, the express mention of the matters embraced in several groups necessarily excluded those not mentioned (citing cases), and, second, the rule of *ejusdem generis* would prevent any *general language* being extended beyond the special language used."

Deceased was guilty of contributory negligence. He hurried to the elevator door, opened it and leaped into a shaft so dark that without taking a good look he could not determine whether the cage was there; he had reason to believe that the cage either would or might be moved during his absence, because by so doing Rundle would be better able to serve the people entering and leaving the building. Such conduct spells only one thing—heedlessness. It is so repugnant to the idea of ordinary care for one's own safety as that the minds of reasonable men could not differ upon the question of whether it was negligent. Substantially similar facts evoked a decision by this court that it was such as a matter of law. (*Zvanovich* v. *Gagnon & Co.,* 45 Mont. 180, 122 Pac. 272.) Very similar facts were present in the case of *Dieboldt* v. *United States Baking Co.,* 72 Hun, 403, 25 N. Y. Supp. 205, and the same conclusion was there reached.

*Mr. Floyd Fluent* and *Messrs. Canning & Geagan,* for Respondent, submitted a brief; *Mr. M. F. Canning* and *Mr. P. E. Geagan* argued the cause orally.

The occupation of the appellant is a hazardous one. The question as to what employments may or may not be embraced within the provisions of section 5 of the Act in question rests in fact and not in law. It is a question to be determined from

an investigation of the particular business and where there is
liability to accident, and it does not have to be great liabil-
ity,—the occupation comes within the purview of the Act.
(*State* v. *J. B. Powles & Co.*, 94 Wash. 416, 162 Pac. 569.)
In drawing their conclusions that the occupation of deceased
was not a hazardous one, the learned counsel for defendant
look only to the wording of the Act and not to the facts of the
dangers in deceased's occupation, which must be taken into
consideration. (See *Treadwell* v. *Whittier*, 80 Cal. 575, 13
Am. St. Rep. 175, 5 L. R. A. 498, 22 Pac. 166; *Hartford De-
posit Co.* v. *Sollitt*, 172 Ill. 222, 64 Am. St. Rep. 35, 50 N. E.
179; *Springer* v. *Ford*, 189 Ill. 430, 82 Am. St. Rep. 464, 52
L. R. A. 930, 59 N. E. 953.) The courts in the above cases
were speaking of a passenger who only casually used the ele-
vator. Deceased was compelled by his employment to be con-
stantly on the cages and in and around the elevator shafts,
and in so doing shared all the perils of the passengers of
which the courts were speaking. Clearly, he comes within
class 5 of the Act, and was entitled to the protection that the
legislature had in mind when enacting the law.

Whether or not any given occupation or employment is
hazardous is a question of fact, to be determined as any other
question of fact, that is, by a proceeding in a court properly
constituted as a trier of fact, sitting with a jury. (*Young's
Case*, 218 Mass. 346, 106 N. E. 1.)

The *Guerrieri* and *Remsnider Cases*, relied upon by appel-
lant, cannot be taken as authority for the construction of our
Act, for the reason that they are in part at least discredited
in their own state, and for the further reason of the difference
and distinction between the Washington Act and our Act. In
both these cases the court seemed to be of the opinion, and
held, that the commission in Washington had the power and
sole power to classify occupations as extrahazardous if there
be, or arise, any in addition to the ones enumerated in the Act.
The same court in the later case of *State* v. *J. B. Powles &*

*Co.,* 94 Wash. 416, 162 Pac. 569, expressly held that the commission had no such power.

The New York cases cited by appellant are not authority for the construction of the Montana Act, in so far as the hazardousness of occupation is concerned, because the New York Act recognizes the existence, as hazardous, of no occupation except the ones therein specifically enumerated. The supreme court of Washington in the *Powles Case, supra,* shows plainly that the matter of hazard is a question of fact. (*Zappala* v. *Industrial Insurance Com.,* 82 Wash. 314, L. R. A. 1916A, 295, 144 Pac. 54.)

The board had no jurisdiction to pass on the question of hazardousness. The burden is at all times on the employer to comply with the Act, and he cannot be heard to say, after an accident, that he should be under the Act and thus escape the consequences of his own dereliction in not invoking the proper remedy to come under the Act. (*State* v. *J. B. Powles Co., supra;* sections 3 (g) and 3 (h) of Montana Workmen's Compensation Act.) In other words, where the rights of third parties are involved, they are not bound by a conclusion of law of the Industrial Accident Board in proceedings to which they were never parties. (*Zappala* v. *Industrial Accident Board, supra; Mackin* v. *Detroit-Timkin Axle Co.,* 187 Mich. 8, 153 N. W. 49.) The Act provides a manner of administering the compensation law provisions, but this does not and cannot preclude a person from resorting to the courts to determine whether or not he is subject to the provisions of the Act. This is a question of fact for the jury. (*Young's Case, supra; State* v. *J. B. Powles & Co., supra; Lahoma Oil Co.* v. *State Industrial Com.* (Okl.), 175 Pac. 836.)

MR. JUSTICE GALEN delivered the opinion of the court.

These appeals are prosecuted from the judgment and order denying defendant's motion for new trial.

The defendant, New York Realty Company, is a corporation organized under the laws of the state of Montana, and is the

owner of the Phoenix Building, which it conducts and operates in the city of Butte. When the accident occurred for which recovery of damages was had, one Clinton Page, a boy twenty years of age, was employed by the defendant in the capacity of passenger elevator operator in such building; the elevator being propelled by the electric power. The action was brought by the plaintiff as administratrix of the estate of the deceased, to recover damages for his physical pain, suffering, and loss of earnings.

The complaint, after charging the corporate existence of the defendant and the representative capacity of the plaintiff, recites that the defendant was the owner of a certain office and apartment building in the city of Butte and was engaged in "operating and running" such building, and in connection therewith "was engaged in a hazardous occupation, to-wit, as a carrier of passengers and its servants by means of elevators operated by power-driven machinery." Further, that the defendant had not complied with the provisions of the Workmen's Compensation Act (Laws 1915, Chap. 96), and was guilty of negligence in and about the operation of the elevator in such building, and that at a time when Clinton Page, an elevator boy in the employ of the defendant, was absent from his cage, the defendant "carelessly and negligently" moved the elevator which he had been operating from the main or ground floor. Further, that "by reason of the dark and dangerous condition" of the elevator shaft and of the hallway and entrance on the main or ground floor leading to the elevator shaft maintained and permitted by the defendant, and because of the negligent moving of the elevator cage by the defendant, Clinton Page, one of the elevator boys, stepped into the elevator shaft and fell a distance of twenty-two feet to the bottom of the shaft, and, as a result of injuries sustained from such fall, died after surviving an appreciable length of time.

The answer of the defendant admits its ownership and operation of the Phoenix Building, the injury and death of Clinton Page, the representative capacity of the plaintiff, and the em-

ployment of Page as an elevator boy at the time of the accident. It further admits that the defendant had not made any attempt to comply with the provisions of either plan 1 or plan 3 of the Workmen's Compensation Act, and that no insurance policy insuring payment of compensation under plan 2 of the Act was filed. And affirmatively the defendant pleads its compliance with plan 2 of the Workmen's Compensation Act and its rejection by the Industrial Accident Board, and set up the defenses of contributory negligence and negligence of a fellow-servant.

The reply consists of a denial of the allegations of election to come under plan 2 of the Workmen's Compensation Act, and of the other separate defenses made by the defendant. A trial to the court and jury was had and resulted in a verdict and judgment in favor of the plaintiff for the sum of $5,000.

Nineteen assignments of error are specified, but in our view but two questions are necessary for disposition of the case on its merits, *viz.*, the hazardous character of the employment and contributory negligence.

The pivotal question in the case is whether defendant was [1] engaged in a *hazardous occupation* in the operation of its passenger elevators by electric power-driven machinery, so as to require its compliance with the Workmen's Compensation Act, or be denied the affirmative defenses of contributory negligence, negligence of a fellow-employee, and assumption of risk.

At the outset it is noted that the defendant takes the position that it was not engaged in a *hazardous employment* within the purview of the Act, and that, if it was, then it had complied therewith by tendering to the Industrial Accident Board, in advance of the accident, full compliance with plan 2 of the Workmen's Compensation Act. Without expressing opinion on the merits of the second alternative defense, it is passed as not necessary of decision in this case.

The causes, from a historical viewpoint, impelling the enactment of workmen's compensation laws and the object thereof,

have heretofore been reviewed at length by this court. (*Cunningham* v. *Northwestern Improvement Co.*, 44 Mont. 180, 119 Pac. 554; *Lewis & Clark County* v. *Industrial Acc. Board*, 52 Mont. 6, L. R. A. 1916D, 628, 155 Pac. 268.) And the constitutionality of such enactments has been upheld. (*Cunningham* v. *Northwestern Improvement Co., supra; Shea* v. *North-Butte Min. Co.*, 55 Mont. 522, 179 Pac. 499.) It is not necessary to do more than call attention to the former decisions of this court on these subjects, and we shall proceed at once to a consideration of the Act for a determination of the question whether the operation of an electric passenger elevator is a *hazardous employment* within the provisions of the Workmen's Compensation Act.

The following extracts from the Act bearing upon the subject are here set forth, comprising all of the provisions thereof necessary for consideration in the determination of the problem confronting us:

"Sec. 3(a). In an action to recover damages for personal injuries sustained by an employee in the course of his employment, or for death resulting from personal injuries so sustained, it shall not be a defense; (1) that the employee was negligent, unless such negligence was willful; (2) that the injury was caused by the negligence of a fellow-employee; (3) that the employee had assumed the risk inherent in, incident to, or arising out of his employment, or arising from the failure of the employer to provide * * * a reasonably safe place to work, or reasonably safe tools, or appliances.

"Sec. 3(b). The provisions of section 3(a) shall not apply to actions to recover damages for personal injuries sustained by household or domestic servants, farm or other laborers, engaged in agricultural pursuits, or persons whose employment is of a casual nature.

"Sec. 3(c). Any employer who elects to pay compensation as provided in this Act, shall not be subject to the provisions of section 3(a), nor shall such employer be subject to any

other liability whatsoever for the death of, or personal injury to any employee except in this Act provided. \* \* \*

"Sec. 3(f). Every employer engaged in the industries, works, occupations or employments in this Act specified as 'hazardous' may on or before the 1st day of July, 1915, if such employer be then engaged in such hazardous industry, work, occupation, or employment, or at a time thereafter, or, if such employer be not so engaged on said date, may on or after thirty days before entering upon such hazardous work, occupation, or employment, or at any time thereafter, elect whether he will be bound by either of the compensation plans mentioned in this Act. \* \* \*

"Sec. 3(g). Every employee in the industries, works, occupations or employments in this Act specified as 'hazardous' shall become subject to and be bound by the provisions of that plan of compensation which shall have been adopted by his employer, unless such employee shall elect not to be bound by any of the compensation provisions of this Act. \* \* \*

"Sec. 4(a). This Act is intended to apply to all inherently dangerous *works and occupations* within this state, *and it is the intention to embrace all thereof* in sections 4(b), 4(c), 4(d), and 4(e), and the works and occupations enumerated in said sections are hereby declared to be hazardous.

"Sec. 4(b). \* \* \* Tunnels, bridges, trestles; \* \* \* iron or steel framed structures or parts of structures, electric light, or power plants, or systems, telegraph or telephone systems; pile-driving, \* \* \* towers or *grain elevators,* not metal framed; \* \* \* *erecting* fireproof doors or shutters; \* \* \* *freight or passenger elevators.* \* \* \*

"Sec. 4(c). Operation (including repair work) of logging, cable, electric \* \* \* or other railroads; \* \* \* *grain elevators.*

"Sec. 4(d). \* \* \* Stamping tin metal; bridge work; railroad, car or locomotive making or repairing; cooperage; logging, with or without machinery; sawmills, shingle-mills. \* \* \*

"Sec. 4(e). * * * Operating stockyards, with or without railroad entry: * * * electric systems not otherwise specified. * * *

"Sec. 5. If there be or arise any hazardous occupation or work other than hereinbefore enumerated, it shall become under this Act and its terms, conditions and provisions as fully and completely as if hereinbefore enumerated. * * *

"Sec. 6(c). Mill means any plant, premises, room or place where machinery is used * * * including elevators, warehouses and bunkers. * * *

"Sec. 6(j). 'Employee' and 'workman' are used synonymously, and means every person in this state, including a contractor other than 'an independent contractor,' who, after July first, 1915, is engaged in the employment of an employer carrying on or conducting any of the industries classified in sections 4(a), 4(b), 4(c), 4(e) and 5 of this Act, whether by way of manual labor, or otherwise, or whether upon the premises or at the plant of such employer, or who is engaged in the course of his employment away from the plant of his employer. * * *

"Part II. Compensation Plan Number 1. Section 30(a). Any employer in the industries, trades, works, occupations, or employments in this Act *specified as hazardous,* by filing his election to become subject to and be bound by compensation plan No. 1, upon furnishing satisfactory proof to the board of his solvency and financial ability to pay the compensation and benefits in this Act provided for, and to discharge all liabilities which are reasonably likely to be incurred by him during the fiscal year for which such election is effective, may by order of said board, make such payments directly to his employees as they may become entitled to receive the same under the terms and conditions of this Act.

"Part III. Compensation Plan Number 2. Section 35(a). Any employer in the industries, trades, works, occupations, or employments in this Act *specified as hazardous,* by filing his election to become subject to and bound by compensation plan

No. 2, may insure his liability to pay the compensation and benefits herein provided for, in any insurance company authorized to transact such business in this state.

"Part IV. Compensation Plan Number 3. Section 40(a). Every employer, subject to the provisions of compensation plan No. 3 shall, in the manner and at the times herein specified, pay into the state treasury, in accordance with the following schedule, a sum equal to the percentage of his total annual pay-roll specified in this section; which said schedule is subdivided into classes, and the percentage of payments or premiums or assessments to be required from each of said classes is as follows: * * * Class 5. *Operating* * * * *grain elevators.* * * * Class 17. Operating dry-docks, * * * *installing freight* or *passenger elevators.* * * * Class 18. Carpenters not otherwise specified; constructing grain *elevators,* not metal framed. * * * Class 27. Any employer and his employees engaged in *nonhazardous* work or employment, by their joint election, filed with and approved by the board, may accept the provisions of plan No. 3. * * * "

Counsel for the plaintiff contend that this Act from its title to the sequel indicates that in all hazardous occupations or employments the three so-called common-law defenses of contributory negligence, act of fellow-servant, and assumption of risk, are abolished, except that the employee may elect not to come within its provisions, and that certain occupations are specifically declared to be hazardous, and that no question of law or fact can be raised in dispute of this declaration. Further, it is contended that as to such employments as are specifically enumerated as hazardous in sections 4(b), 4(c), 4(d), and 4(e), no question of fact is allowed to be raised concerning the subject, but that as respects all other occupations and employments that may be *in fact* hazardous, whether existing at the time of the enactment of the law and omitted from enumeration or not, they come under the catch-all provision of section 5, *supra.*

By section 24(a) of the Act, it is provided: "Whenever this
[2]    Act, or any part or section thereof, is interpreted by a
court, it shall be liberally construed by such court." But such
legislative direction does not warrant the court in inserting
that which has been omitted. (Sec. 7876, Rev. Codes.) And
it can readily be seen by reference to the Act that the opera-
tion of passenger elevators is not specifically included as a
*hazardous employment.* If embraced within the Act at all, it
can only be under the general provisions of section 5. Though
section 40(a), class 27, of the Act recognizes hazard incident
to all employments, the Act provides statutory compensation
only for injuries received in employments recognized as in-
herently and constantly dangerous, specifically enumerated or
properly included under the provisions of section 5 in applica-
[3]    tion of the doctrine *ejusdem generis.* By section 5 of the
Act, the legislature in effect declared: We have enumerated all
the hazardous occupations we can think of, but should there be
any omitted from consideration and not specified, or new em-
ployments arise of like hazardous character, then they shall be
considered as included. And in our opinion the legislative in-
tent is conclusively indicated to exclude the operation of pas-
senger elevators, for the reason that the word "elevators" in
the Act is referred to at least six times in connection with
grain elevators and the work of erecting freight and passen-
ger elevators specified as hazardous employments. Clearly, the
legislature had in mind the subject of elevator operation and
purposely excluded it from the Act. At any rate, it is appar-
ent that it was not an inadvertent omission.

Under the rule *ejusdem generis,* the general language em-
braced in section 5 of the Act under consideration does not, in
our opinion, embrace the operation of passenger elevators, not
being expressly enumerated in the provisions of the Act as
hazardous nor of like character to those specified. That section
has reference only to such employment or industries, other
than those specifically named, as are of the same general char-
acter then existing or which may subsequently arise. Where

general words follow an enumeration of particular subjects, such words must be held to include only such objects or things as are of the same general character of those specifically mentioned. (Lewis' Sutherland on Statutory Construction, 2d ed., sec. 422.)

Under the doctrine of *expressio unius est exclusio alterius,* a [4] statute prescribing a new right and a particular remedy must be strictly construed and followed. (Lewis' Sutherland on Statutory Construction, 2d ed., sec. 491.) The legislature had the undoubted power to prescribe by its enactment what occupations are extrahazardous, as it specifically did by the enumerations in sections 4(b), 4(c), 4(d), and 4(e) of the Act; and not having specifically named the operation of passenger elevators, which were then in common use, they must be held to have been excluded from legislative determination as employment considered hazardous. Not being expressly included in the Act, the court cannot read such employment into the statute. (Rev. Codes, sec. 7876.)

We do not go to the extent of holding that hazardous occupations other than those specifically enumerated may not come within the provisions of the statute, but rather that the statute applies only to the employments specifically enumerated and such as are *ejusdem generis,* whether then existing or subsequently arising.

In the case of *Guerrieri* v. *Industrial Insurance Com.,* 84 Wash. 267, 146 Pac. 609, the court had under consideration the same question in construction of the workmen's compensation law with respect to its application to freight and passenger elevator operators not expressly enumerated in the Act, and through Mr. Justice Chadwick the court said: "It is the contention of appellant that the 'elevators,' which we have italicized, means freight and passenger elevators. When tested by the ordinary rules of statutory construction, we think it is clear that this is not so. The context of the section—the setting of the word—indicates a legislative intent to cover classes of business rather than particular pieces or kinds of machin-

ery. Thus: 'Factories, mills, * * * breweries, elevators, wharves, docks, * * * *etc.'* * * * Section 4 schedules the rates to be paid. No schedule specifically covers passenger or freight elevators. In the same section under the subhead 'Construction Work' industries are classified. In class 5 are found the words 'freight and passenger elevators.' Here, as before, the context and setting of the words indicate that the statute means those engaged in the manufacture or work of construction of freight and passenger elevators. Bearing in mind the title of the classification 'Construction Work,' the paragraph reads: * * * 'Erecting fireproof doors or shutters; blast furnaces; concrete chimneys; freight or passenger elevators. * * *_ ' This conclusion is fortified by reference to class 21, page 354. Under the subtitle 'Operation (including repair work),' we find the classification 'grain elevators.' This brings section 4 into harmony with sections 2 and 3 and makes it certain that there was no purpose to cover the operation of an ordinary freight or passenger elevator or to recognize it as an extrahazardous occupation or as one inherently dangerous."

In a later Washington case reaffirming and approving the *Guerrieri Case, supra,* it appears that a janitor in an office building was injured while scrubbing down the walls and floor of the elevator shaft beneath the cage. The elevator was operated by electricity. The Workmen's Compensation Act provided that the Act shall apply to all inherently hazardous employments, including, factories, mills and workshops where machinery is used. It was held that, though the elevator was operated by electricity, the shaft could not be considered a workshop, that the employment was not extrahazardous, within the statute, and that the janitor's rights were not governed thereby. (*Remsnider* v. *Union Savings & Trust Co.,* 89 Wash. 87, Ann. Cas. 1917D, 40, 154 Pac. 135.)

In the administrative department of the state, it has been held by the Industrial Accident Board and the Attorney General that the operation of an office and apartment building is

not included in the law (*In re New York Realty Co.*, decided by Industrial Accident Board, September 29, 1915; 6 Official Opinions of Attorney General, p. 206), and it is noted that such holding of the Industrial Accident Board was made upon the rejection of defendant's application to be included within the provisions of the Compensation Act, prior to the accident complained of. In accordance with our view of the law, such holdings were justified.

It is our opinion that whether the employment of a person [5] or any accident comes within the provisions of the Act is a question of law rather than one of fact. (Harper's Workmen's Compensation, 2 ed., pp. 140, 141.) This view is also fortified by the decisions of the courts. In the case of *Courter* v. *Simpson Construction Co.*, 264 Ill. 495, 106 N. E. 353, the court, in considering the question of the right of interested parties to a review by the courts of a determination made by the Industrial Board, said: "The Industrial Board has no jurisdiction to apply the Act to persons or corporations who are not subject to its provisions nor to an accident not within the provisions of the Act. If it did so it would not be 'acting within its power.'" (See, also, *Uphoff* v. *Industrial Board*, 271 Ill. 319, Ann. Cas. 1917D, 1, L. R. A. 1916E, 329, 111 N. E. 128; *Borgnis* v. *Falk Co.*, 147 Wis. 327, 37 L. R. A. (n. s.) 489, 133 N. W. 209; *State* v. *J. B. Powles & Co.*, 94 Wash. 416, 162 Pac. 569.)

In our opinion, based upon a construction of the statute, the defendant was not, by virtue of the Workmen's Compensation Act, deprived of its common-law defenses, the employment not being hazardous as defined by the Act, nor *ejusdem generis*.

The next question is whether the plaintiff was guilty of such [6] contributory negligence as will bar recovery as a matter of law. But one eye-witness to the accident testified for plaintiff. His evidence is substantially as follows: "My name is A. B. Buchner and I am in the real estate business. I was in the Phoenix Building on the eighth day of September, 1916, and at that time saw Clinton Page, the elevator boy, but did

not know him by that name. I saw the boy that was operating the elevator. When I first saw him I was .* * * waiting for the elevator, and the boy came in on the run and went to the elevator door. He opened the door by using his hands and throwing his weight against the door. As I recall, the door slides north. His hands, when he opened the door, were about halfway up the door, I would imagine, on the south side of the door. He pulled the door toward the north. I saw the movements he went through in opening that door. It would be rather difficult to estimate the pound force necessary to open the door, but he used force with his hands and the weight of his body against the door. He took hold of the door and threw the weight of his body on it, and against it, and the door came open. The operation required a matter of seconds. When the door was opened he swung in behind the door and went down. Evidently the elevator cage was not there. I don't know where the elevator cage in the north shaft was at that time; didn't notice it on the main floor. The boy fell down the south elevator shaft. The usual lights were there, and enough that one can see the elevator was there when the door was opened. The boy did not hesitate when he stepped in; in fact, he didn't step in—he jumped in. As he opened the door his hands came north, and he swung right around faced toward the west, that is, after he swung in he would be facing toward the west; he was facing toward the west when he dropped. I couldn't say and don't know whether there was sufficient light in that shaft so you could ascertain if the elevator was there had it been standing there with the light out and the door open. There was plenty of light from the front windows to see the elevator door. * * * When I said the boy came in on the run, that is the best way I can describe it. The boy came in off the street on a run; well, moving rapidly. He was not walking. He was what I'd call running, moving rapidly. After the accident, the elevator in the south shaft was brought down from above from an upper floor. There was a light in it. I presume it was an elevator

operator who was operating it.  I didn't know who it was at the time and am not personally acquainted with him now. * * * When I saw the boy fall down the shaft, I was on the main floor, the street floor of the Phoenix Building." And on cross-examination the witness testified: "Q. I will ask you if you will, Mr. Buchner, to assume that the clerk's desk over there with the wire grating on top is the elevator door, the door leading into the elevator shaft, and I will ask you also, if you can, to illustrate to the jury the manner in which the young man pressed against the door in opening as he came in; just go over to that thing and consider it the door and illustrate to the jury how it was done and how he got up to it, moving as near as you can at about the rate of speed you think he did.  A. [Illustrating] It is pretty hard for an old man to be as quick as a young man was.  At least, the boy came in on a run and approached the door in this manner and threw his weight against the door and came back and swung right around like this and went down.  He was moving considerably faster than I was; he was on a run. * * * The weight of the boy's body was against the door.  Then he pulled with the left shoulder and side against the door.  He then sprung on the door.  He threw his body against the door as soon as he sprung it, and after the door was sprung he pulled the door toward the north, and as the end of the door reached his body he swung so as his right shoulder passed the edge of the door, and his back was to the east and his face toward the west going inside the shaft.  I saw him going down.  That was the last I saw of him in that operation."

Harold F. Rundle, who at the time of the accident was employed as an elevator boy at the Phoenix Building operating the elevator on the north side, testified as a witness for the plaintiff substantially as follows: "There are two elevators there.  I was working there in the month of September, 1916, in that same capacity.  I knew Clinton Page and was working there the day that Clinton Page was injured; saw him before the injury and saw him after the injury.  On that day he was

working on the elevator, running elevator. He was one of the elevator boys as they are called here. In running it, I mean he was one of the operators of the elevator the same as I was. He was operating the elevator cage on the south side. This accident happened at 2:30 in the afternoon. I saw Mr. Page after the accident. As soon as he dropped, I came down. * * * I was in the south cage at the time I found out he had fallen down the shaft. The north cage at that time was on the main floor of the building with the light off. When the door is closed and the light off, you cannot see these cages standing there when you walk in, very well, unless you should happen to look pretty good; stand at the door and look in and take a good look to determine. Mr. Page had worked there three days. He was on his third day, if I am not mistaken. Those elevator doors are opened and closed by a latch from the center of the door; right even with the glass and the metal in the glass, come to the bottom of the metal, and right there is the catch just below the glass. That is operated from the inside. These doors, when they are closed from the inside, are opened only from the inside. On or about the eighth day of September there were three of these doors in this elevator entrance that could be opened from the outside when the cage was closed, and those entrances were the sixth on the north side, the fifth on the south side, and the main floor on the south side. All the others could not be so opened. If the catches and locks of the doors on the sixth, fifth and first were in the same shape as they were on the other floors, they could not be opened from the outside. Those doors were in that condition ever since I worked there, all the time I worked there, and that was during all the time since I went to work in November, 1915, until I quit in June, 1917. There is little difference in the operation of these two elevator cages, the one on the north and the one on the south side of that building. One is faster than the other. The south side is the fastest elevator cage. The south side runs faster than the one on the north side, makes its ascent and descent more rapidly. The

space or distance through which these elevators run was approximately eighty feet. If the elevator is away from the first, the main floor, and one steps into the shaft, they would fall a distance of around twenty-two feet, or something like that. * * * That elevator is operated by an electric system and was such a system during all the time I was operating there. * * * There is no way of signaling or way of securing those doors when the elevator is taken away or moved from any certain floor. You cannot tell when the elevator leaves the floor by signal. The people signal where they are at. There is nothing to show when stepping or looking into the shaft whether or not the elevator is there. * * * The elevator on the south side will perform acts and things other than the one on the north side. * * * At the time Mr. Page fell down the shaft, the north cage was on the main floor standing on the main floor with the light off and the doors closed. Mr. Page had not been operating the north cage at the time. He had been operating the south cage. I remember when he left the building, and he was gone, I should judge, between five and ten minutes. At the time he left the building he had been operating the south cage, and at that time I was engaged in operating the north cage. The glass on these elevator doors has woven wire through it and is quite a thick glass. I have opened the south cage door from the outside, and it required quite a bit of strength to open it. A boy such as I at that time could readily open it from the outside and did not need to throw his whole weight against it to open it; just push against it and it would come back. I couldn't do that with the one on the other side; couldn't do that with any except that and the one on the fifth and the one on the sixth. All of the others were secure. * * * When Mr. Page left the elevator on the south side, he left the door closed, and he left the elevator there with the light out. I had been working there quite a while before Mr. Page came. * * * "Q. Did you have any instructions from the manager about the operation of these different elevators? By the manage-

ment, I mean Mr. R. C. Howell. A. I had instructions that you are not supposed to leave your elevator during working hours, and, according to how you are supposed to run them, one is supposed to be going up and the other is supposed to be going down. Q. Was there any particular instructions relating to the south side? A. No particular instructions. Q. As to the different elevator boys? A. Well, when there was a new elevator boy, we had instructions to put him on the other elevator, because it was the safest, and to break him in good first before you put him on the other elevator." On cross-examination the witness testified: "In each cage there was a light. There is supposed to be a light in each cage, and on September 8, 1916, at the time this accident happened, there was a light in each cage, and those lights were sufficient to show the position of the cage to a person coming in or going out. I took the elevator from the main floor after Page had left it and operated it for the carriage of passengers on the south shaft, and did that in my regular course of work. I used that because it was faster, and when working alone I could use the south side elevator. If a boy is left alone, he operates the south side to carry the passengers because it was a faster moving elevator."

In the case of *Zvanovich v. Gagnon & Co.*, 45 Mont. 180, 122 Pac. 272, the plaintiff claimed damages against the defendant for alleged disregard of its duty to use ordinary care to furnish him a reasonably safe place in which to work, in that it carelessly left an open shaft in a building unguarded, and that while passing through the building for the purpose of seeking a place to urinate he fell into the unguarded shaft and was injured. After reviewing the evidence, the court said: "We think the plaintiff was properly nonsuited, for the reason, as disclosed by his own testimony, that he was guilty of contributory negligence. We shall assume, without analyzing the testimony on that point, that the act of the defendant in leaving the elevator shaft unguarded was negligence. The rule is that, if the issue of negligence or contributory negli-

gence is a fairly disputed question of fact, it must be resolved
by the jury; but if the evidence is perfectly clear, it is for the
court. (*Wall* v. *Helena St. Ry. Co.*, 12 Mont. 44–61, 29 Pac.
721.)  We think this evidence is so clear and convincing that
reasonable men of fair and unbiased minds cannot differ as to
its effect.  The plaintiff was employed on the outside of the
building; a toilet had been reserved for his use about 150 feet
distant; he had used it on different occasions during the two
months of his employment; once he had entered the west wing
through the north door, the same door that he used on the
day of his injury, for the purpose of urinating.''  And the
court quotes with approval the language of Mr. Justice
Wolverton, in the case of *Massey* v. *Seller,* 45 Or. 267, 77 Pac.
397, as follows: '' 'Now, if it was so dark in there that he
could ''see nothing,'' it was certainly an act of folly on his
part to enter on a cruise of exploration and discovery, without
stopping to determine whether it was safe to proceed.  To bolt
headlong into a place little known, and where the senses can-
not take note of it, is not the act of a prudent man, and there
is no chance for any other inference or deduction concerning
it.  Reasonable minds could not come to any other conclusion
touching it, so that there is nothing for the jury to determine,
and the trial court very properly declared the result, as a mat-
ter of law.' (See *Johnson* v. *Maiette,* 34 Mont. 477, 87 Pac.
447; *McCann* v. *Atlantic Mills,* 20 R. I. 566, 40 Atl. 500; *Piper*
v. *Cambria Iron Co.,* 78 Md. 249, 27 Atl. 939; *Geis* v. *Ten-
nessee, C. I. & R. Co.,* 143 Ala. 299, 39 South. 301; *Bridger*
v. *Gresham,* 111 Ga. 814, 35 S. E. 677; *Hilsenbeck* v. *Guhring,*
131 N. Y. 674, 30 N. E. 580; *Gillespie* v. *John W. Ferguson
Co.,* 78 N. J. L. 470, 74 Atl. 460.  See, also, *Meehan* v. *Great
Northern Ry. Co.,* 43 Mont. 72, 114 Pac. 781, and *Molt* v.
*Northern Pac. Ry. Co.,* 44 Mont. 471, 120 Pac. 809.)''

As stated by Mr. Chief Justice Brantly, speaking for the
court in the case of *George* v. *Northern Pac. Ry. Co., ante,*
p. 162, 196 Pac. 869: ''In this jurisdiction it is the rule that con-
tributory negligence is a matter of defense to be established by

preponderance of the evidence. The plaintiff has made out a *prima facie* case when his evidence discloses injury to himself and that the negligence of the defendant was the proximate cause of it. (*Nelson* v. *City of Helena,* 16 Mont. 21, 39 Pac. 905; *Hunter* v. *Montana C. Ry. Co.,* 22 Mont. 525, 57 Pac. 140; *Monson* v. *La France Copper Co.,* 39 Mont. 50, 133 Am. St. Rep. 549, 101 Pac. 243; *Therriault* v. *England,* 43 Mont. 376, 116 Pac. 581; *Howard* v. *Flathead Ind. Tel. Co.,* 49 Mont. 197, 141 Pac. 153.) It is the rule also that when the circumstances attending the injury as detailed by the plaintiff's evidence raise a presumption that he was not, at the time, in the exercise of due care, he has failed to make out a case for the jury. The burden is then upon him, and if he fails to introduce other evidence to remove this presumption, he is properly nonsuited. (Cases cited *supra; Harrington* v. *Butte, A. & Pac. Ry. Co.,* 37 Mont. 169, 16 L. R. A. (n. s.) 395, 95 Pac. 8; *Longpre* v. *Big Blackfoot Milling Co.,* 38 Mont. 99, 99 Pac. 131; *Zvanovich* v. *Gagnon & Co.,* 45 Mont. 180, 122 Pac. 272.)'' (See, also, *Neilson* v. *Missoula Creamery Co., ante,* p. 270, 196 Pac. 357.)

From all of the affirmative proof introduced on the part of the plaintiff in this case, it seems clear that the decedent was not only guilty of contributory negligence, but that he was [7] foolhardy to such an extent as to constitute gross negligence on his part. The burden rested upon the plaintiff to prove by a preponderance of the evidence that the negligence of the defendant was the proximate cause of the decedent's injury. Assuming the defendant guilty of negligence, from all of the evidence introduced it does not appear that the decedent, at the time of the accident, exercised due care for his own safety, and therefore a case for the jury was not made. Applying decisions of our court to the evidence introduced in this case, there is but one conclusion, and that is that the carelessness and negligence of the decedent was a proximate cause of his injury and resultant death. His contributory negli-

gence, under the evidence, is proper for decision as a matter of law, rather than one of fact.

For the reasons stated, the judgment and order are reversed, with directions to enter judgment in favor of the defendant.

*Reversed with directions.*

MR. CHIEF JUSTICE BRANTLY and ASSOCIATE JUSTICES REY-NOLDS, COOPER and HOLLOWAY concur.