BRUCE, ADMINISTRATOR, RESPONDENT, *v.* McADOO, DIRECTOR-GENERAL, ETC., APPELLANT.

(No. 4,905.)

(Submitted October 25, 1922. Decided December 11, 1922.)

[211 Pac. 772.]

*Personal Injuries—Master and Servant—Workmen's Compensation Act—Provisions Exclusive—Injuries Caused by Third Person—Election of Remedies.*

Workmen's Compensation—Provisions Exclusive of Other Remedies—Injuries Caused by Third Person—Election of Remedies.
1. Plaintiff's intestate, an employee at a coal mine tipple, was killed on the premises of his employer, while assisting to move a box-car on a spur-track leading to the tipple for the purpose of loading, the accident having been caused by the sudden stopping of the car due to a brakeshoe becoming loose and falling on the track in front of the moving car. His widow claimed and was paid compensation for his death under the provisions of the Workmen's Compensation Act. His administrator thereupon brought action against the Director-General of Railroads to recover damages for

Rights and remedies under workmen's compensation acts where injuries were caused by negligence of third person, see notes in **Ann.** Cas. 1915D, 156; 1916A, 358; L. R. A. 1916D, 628; L. R. A. 1916F, 319; L. R. A. 1917D, 80; L. R. A. 1918F, 524.

[65 Mont. 275.]

negligence in furnishing the coal company a defective car. *Held,* that the action did not lie, the provisions of the Compensation Act with relation to compensation being exclusive of any other remedy, except where the injury was caused by the negligence of a third person away from the plant of the employer, in which case alone' the employee or his beneficiaries in case of death are given the right of election whether to take under the Act or seek damages from such third person.

Same—Personal Injuries—Defective Instrumentalities Owned by Third Person—Liability for Damages.

2. The coal car furnished the coal company, decedent's employer, by the railroad company· was an instrumentality employed by the coal company at its plant in connection with its coal mining operations and within its exclusive possession and control at least for the time required to load it, and therefore for any injury caused to one of its employees during that time, by reason of a defect in the car it, and not the railroad company or the Director-General, was liable.

*Appeals from District Court, Musselshell County; C. C. Hurley, Judge.*

ACTION by William L. Bruce, as administrator of the estate of Q. Price, deceased, against William G. McAdoo, Director-General of Railroads, and another. From a judgment for plaintiff and an order ˙denying its motion for a new trial defendant named appeals. Reversed and remanded, with directions to dismiss complaint.

*Messrs.·Murphy & Whitlock* and *Mr. T. J. Matthews,* for Appellant, submitted a brief; *Mr. A. N. Whitlock* argued the cause orally.

(NOTE: The cases cited by appellant on the point decided are incorporated in the opinion.)

*Messrs. Frank & Gaines* and *Messrs. Maris & Mercer,* for Respondent, submitted a brief; *Mr. R. F. Gaines* argued the cause orally.

The Workmen's Compensation Act clearly assumes only to regulate the relations of employers and employees and does· not by its terms cover the effect or consequences of negligence of a third person causing injury to an employee upon the

premises of his employer. If the Workmen's Compensation
Act had not been passed, a cause of action for negligently
killing Price would have survived and could have been prose-
cuted by respondent against appellant. For the appellant
to say that such a cause of action cannot be asserted because
of the enactment of the workmen's compensation law is in
reality to say that the survival statutes of Montana, Sections
6486 and 6494 Revised Codes of 1907, have in effect been re-
pealed. It is the contention of respondent that the only effect
of the Act, as above stated, is to regulate the interdependent
relations of employer and employee and to substitute for the
old rights, remedies and defenses which surrounded the rela-
tion of master and servant a new form of procedure. This is
borne out by the terms of the Act and by the decision in the
case of *Shea* v. *North Butte Mining Co.,* 55 Mont. 522, 179
Pac. 499; and the effect of this is an admission that in so far
as the employer and the employee are concerned these two
last-named sections have been impliedly repealed. But we
assert that there has been no express repeal of these sections
by the terms of the Act or any implied repeal of these sec-
tions as far as concerns persons between whom the relation
of employer and employee does not exist.

This matter is very largely to be determined by the pro-
visions of the Workmen's Compensation Act with such aid
in its construction as may be derived from decisions from
courts of other jurisdictions which have statutes similar in
effect, as far as this question is concerned, to the Montana
law. There are to be found many decisions in which it is
said that the Act destroys the right of action of the injured
employee and his dependents against third persons, and many
others to be found in which it is said that this right of
action is not destroyed; but in all of these decisions it will
be found upon examining the Acts in question that they are
specific upon this question. We shall not attempt to cite
any of these decisions, but in citation of cases will, with one
exception, confine cases to states where the Workmen's Com-

pensation Acts are silent upon the question of whether the cause of action against a third person survives. The exception is in connection with the Workmen's Compensation Act of the state of Washington. The Washington supreme court has declared all rights of action of employees. against third persons tort-feasors are wiped out by the express language of the Act, which says: "Except as in this Act otherwise provided, such payment shall be in lieu of any and all rights of action whatsoever against any person whomsoever."

The case to which reference will be made in connection with the Washington Act is *Meese* v. *Northern Pac. Ry. Co.,* 211 Fed. 254, 127 C. C. A. 622. Reference to it is not made as an authority holding that the Washington Act does not destroy rights of actions of employees against third persons but because of the clear statements therein contained with reference to fundamental principles of law involved in this discussion. The circuit court of appeals' decision in the *Meese Case* was reversed on appeal to the supreme court. But only because of the fact that the supreme court of the United States held that in the case of *Peet* v. *Mills,* 76 Wash. 437, Ann. Cas. 1915D, 154, L. R. A. 1916A, 358, 136 Pac. 685, the supreme court of Washington had construed the Workmen's Compensation Act prior to the decision by the circuit court of appeals and as abolishing all rights of action against all persons in instances where employee and employer were under the Act and the employee was entitled to compensation by virtue of the provisions of the Act. The supreme court of the United States did not assume to dispute the principles of substantive law announced by the circuit court of appeals. Montana has, of course, never decided the question here presented, and we submit that the statement of substantive law as announced in the *Meese Case, supra,* is in fact correct and should be followed here.

In the states of Ohio, Texas and West Virginia the workmen's compensation acts at the time the hereinafter decisions were rendered did not either expressly preserve a right of ac-

tion against third persons either for injuries occurring upon or away from the plant, nor did they expressly abolish such rights of action. In Ohio the Act in one place says that if the employee or his legal representative accepts compensation he "waives his right to exercise his option to institute proceedings in court." Yet, the Ohio courts have held that a receipt of money under the Compensation Act does not prevent action against a third person tort-feasor. (*Ohio Traction Co.* v. *Washington*, 6 Ohio App. 273.)

In the case of *City of Austin* v. *Johnson* (Tex. Civ. App.), 204 S. W. 1181–1183, the facts were that the injured person was at the time of his injury in the employ of a telephone company which had accepted and was bound by the provisions of the Texas Workmen's Compensation Act, and because thereof the employer or insurance carrier for the employer became liable to him for the injuries he had received and because of such liability existing had settled with the employee in the manner provided by the Workmen's Compensation Act. The employee had accepted such settlement and it was claimed he was therefore precluded from recovery against the third person tort-feasor. The court held otherwise. (See, also, *Mercer* v. *Ott*, 78 W. Va. 629, 89 S. E. 952; *Merrill* v. *Marietta Torpedo Co.*, 79 W. Va. 669, 92 S. E. 112.) These decisions, we believe, furnish complete support for the arguments advanced relative to inapplicability of the defense claimed by appellant under the Workmen's Compensation Act.

MR. JUSTICE GALEN delivered the opinion of the court.

These appeals are prosecuted by the defendant Wm. G. McAdoo, Director-General of Railroads, from the judgment and from an order denying his motion for a new trial.

It appears from the pleadings and the proof that the action was instituted by the plaintiff as administrator of the estate of Q. Price, deceased, to recover damages for the death of plaintiff's intestate, alleged to have resulted from the negli-

gence of the defendant in delivering to the Star Coal Company, on a side-track leading to its tipple or loading place, an empty freight-car to be loaded with coal, having a defective brake-beam. At the time of the injury and death of the decedent, March 9, 1918, and prior thereto the Star Coal Company was operating a coal mine and engaged in the coal-mining business at Musselshell. The deceased was then, and for more than a year prior thereto had been, an employee of the coal company regularly engaged in the performance of his duties and experienced in the work of loading coal for shipment from its plant. There was constructed and in use a spur or industrial track leading from the main line of the Chicago, Milwaukee & St. Paul Railroad to the plant of the coal company, used exclusively by it; and in connection with the business operations of the latter empty coal cars were, as ordered from time to time, delivered to the coal company on its side-track for loading, from which point of delivery the cars were by the coal company run by gravity to the tipple on its property, and there loaded by it with coal for shipment.

On the morning of March 9, 1918, the deceased while regularly engaged in the duties incident to his employment, moving a box-car from the place where it had been spotted on the side-track to the tipple, there to be loaded with coal, was on top of the car handling the brakes, so as to stop the car at the desired place. The car was started by loosening the brakes and then using a pinch-bar to move the wheels of the car forward on the rails until under way through gravity. After the car had moved twelve or fifteen feet, the decedent applied the brakes and stopped it, in order to test the brakes, as was customary, so as to be sure of his ability to stop it at the place of loading after the car got under momentum. At the moment of the accident, a fellow-employee was pushing on the rear end of the car, and it was moving slowly, about two and one-half miles per hour. The brake-beam became loosened in consequence of the loss of a certain bolt by which

it was held in place, dropped to the track, and the brake-shoe stuck in a frog of a switch, bringing the car to a sudden stop, as a result of which the deceased was thrown violently forward from his position at the brake on top of the car to the ground in front of the car, sustaining serious injury, from which he died on the evening the same day.

Descriptive of the circumstances attendant at the time of the accident, and to make the facts more clear, we quote briefly from the testimony of plaintiff's two most important witnesses.

Willis B. Strang on direct examination testified in part: "I was what we called down there a 'tipple helper.' I helped Mr. Price on the tipple. I was Mr. Price's helper on the morning he was killed. I was working with him on the same car at the time of the accident. At the time he got hurt, I wasn't on the car. I started the car for him after he had gotten up to the brake, and during the cold weather the cars moved sluggishly, and I imagined I could help the car along by pushing on it myself, and at the time of the accident I was pushing on the car. The car was moving south, and I was on the south end of the car and on the left-hand side facing in the direction it was moving. At the time the car stopped, I would say it was moving from two to two and one-half miles an hour. I noticed the car stop suddenly. When the car suddenly stopped, Price was at the brake, as near as I know; I wasn't in a position where I could see him. Price was on the top of the car. I did not see him fall or thrown from the car. I did not see him coming through the air. After the accident I looked at the brake rigging to see what was the cause of the accident. What I saw in the car that was out of the ordinary was that the brake-beam back of the front wheels calling the front wheels on the south end of the car or in the direction in which the car was moving— the brake-beam on the front wheels had dropped down on the right-hand side facing in the direction of the moving of the car, and this brake-shoe on the right-hand side had dropped

down and caught in the point of a frog and had stopped the car. I looked at the rigging, and I noticed that a bolt at the top end of the hanger which connects the brake-beam to the body of the car was missing. I walked up the track as far as the car had been that morning, and I looked carefully going up and looked on the way back again down the track to see if I could find that bolt, and I couldn't find it. No one else found it that I know of. I was there when Price first climbed up on that car that morning. One man must be up on top of the car to handle the brake to release it so that the car may start and apply the brake as necessary on the downgrade so that the car will not gain too much speed going down, and so he can stop it at the proper place. On top of this particular car there was one brake-staff. The brake mechanism of the car is controlled by one staff on the car. That brake-staff was on the south end of the car as the car was moving; in other words, in order for Mr. Price to be at the brake-wheel, it was necessary for him to be at the front end of the car that morning as it went down the grade. Mr. Price had that morning what is ordinarily called a brake-stick. When these cars stand for a time on the track up there, we have a pinch-bar up there all the time. It is called a Sampson car mover that we use in starting cars. I did not break that bolt out of that brake rigging that morning with the Sampson car mover that I was aware of. I don't see how it would be possible to do that. The car starter is nothing more than a pry—a crowbar with a straight side on one side and a bevel edge down say an inch or an inch and a half—just put it under the wheel here and pry down giving you a good leverage and start the car off. After the car is once started, it is not necessary to use the starter. On our grade there it is usually necessary to apply the brakes. After the sudden stopping of that car, I went to Price immediately. He was on the ground about eight or ten feet in front of the car and a little to the right-hand side of the car. He was thrown into the right-hand loading track—the loading track

on the right hand from the one we were going to put the car on. He was alive at that time. He was breathing.''

On cross-examination he testified in part: ''I was walking at a slow rate. I couldn't say exactly how far I had proceeded with the car before it came to this sudden stop, but I would say approximately 150 feet. I would say I was approximately 200 feet from the tipple at the time the car started. As near as I can remember now, the car was first spotted at a distance of about 350 feet from the point at which it was to be loaded; that is an estimate pure and simple. I also had with me at that time a little short piece of 2x4 perhaps four or five feet long in my hands, which I picked up to use as a squeegee in case the car should run away. I mean by that chucking it in front of the wheel on the rail so as to stop the car. I carried that along with me for that purpose. I used that 2x4 on that car, but not for the purpose of squeegeeing the wheels. Q. Price was up on top in control of the brake before the car was started; he was up there at the time I started the car. Just previous to that being done I made use of this stick or club that I had in my hand—this 2x4. I went around to each one of the brake-shoes, that would be eight in all, and tapped them with the end of the 2x4 lightly to draw them loose. Sometimes in cold weather the brake-shoes stick to the wheels, and it makes it impossible to start the car with a car starter. It was cold that morning, but it warmed up during the day. During the night previous and up to the time of the accident, it was cold as compared to a mean or even temperature, but it wasn't the coldest day of the year; it was medium cold. I took this 2x4 and tapped or hit each brake-shoe on the car. There were eight in all. I wouldn't recollect now just the exact spot on the brake apparatus that I would hit, except that it would be right close to the brake-shoe. I remember having tapped the brake-shoes, but I don't remember the exact spot. I recall that I did that at the direction of Q. Price. He told me at that time to examine and look at the brakes and

to jar them loose from the wheels. That was just before he got on the car. As to whether, coming up to the car, Q. Price himself made a casual examination or a hasty examination of any part of the brake rigging, counsel referring particularly to the chain which wraps around the brake-staff, I will say he told me before I started the car that I should rewrap that chain which had wrapped over itself on the bottom end of the brake-staff. It had wrapped over itself and gotten a little out of place. After the car was started I would say that it proceeded perhaps twelve or fifteen feet before it was slowed up at all. The car started slowly and moved sluggishly, and he let it get up a little speed before he tried his brake. He let it get up enough speed so that he could apply his brake without completely stopping the car. After the car had gotten some momentum and I had traveled a distance of twelve or fifteen feet, Q. Price on top of the car set the brakes and then released them. That was his common practice. That was for the purpose of testing the brakes and to see whether they would take hold or not. When I examined the car before starting to drop it down to the loading track was when I used the stick to jar loose the brake-shoes. At that time the brake-shoe which afterwards caught in the frog on the track was in place. As to whether it was neither above nor below its natural resting place where it engages the wheel but was, so far as I observed, in place, as were all the other brakes, I will say, if it was out of place, it wasn't enough to be noticeable to me. Asked if it had been seriously out of place, I would, of course, have observed that in view of the fact that I and Q. Price were about to let the car down. I will say, if it were hanging down, I would have noticed it. As I remember it, there was about an inch of snow on the ground that morning. I don't know whether Q. Price used his brake-stick at the time he tightened up the brakes to test them twelve or fifteen feet from where we started the car or not. I didn't see him at that time. All

[65 Mont. 275.]

I know is that he brought the car almost to a stop, slowing it down, and then immediately released the brakes again.''

And on redirect examination he said in part: ''There was no difference at all in the way Q. Price and I handled this car from how we would have handled any other cars; we treated this one the same as any. This business of going up there and noticing the chain wrapping itself on the bottom of the staff, that wasn't anything out of the ordinary. We find a great many chains that way. We unloosen the brake and tighten it up and make it as it should be without thinking anything about it. Going around and tapping the brake-shoes on a frosty morning is the usual course of business. I only tap one brake-shoe at a time.''

Mr. J. C. F. Creecy, an eye-witness to the accident, was working at the loading chute or tipple. He estimates that the car was stopped resulting in the accident a distance of seventy-five or eighty steps from the tipple. In part he testified: ''I noticed Price just a bit before the accident happened. It seemed to me that he was kneeling down on the end of the car near the brake-wheel with one hand on the brake-wheel and the other hand on the brake-stick for one moment, and then possibly half a minute later I looked up and seen him thrown from the car. This car that he was on was a box-car. He was at the end of the brake-wheel. He was in a position where he could brake the car as it came down the grade. When he was thrown from the car he landed in front of the car. In other words, he was on the head end of the car as it came down the grade—the brake end of the car. The car did not run over him. The brake-beam had broke loose at one end of it, and the brake-shoe had caught against the frog of the switch, and he was thrown probably ten or fifteen feet away from the end of the car and lit on his head; in other words, he was going with the car, and the car suddenly stopped, and he went on. He lit on his head. I helped pick him up. At the time we picked him up he was breathing a little, but not conscious so he would know any-

thing. I saw him after that; I saw him most of the day until they taken him away, which was some hours later. I looked at this brake rigging, but I didn't give it a thorough examination. I stopped and see it was hanging down at one end. It had been broken loose. I never noticed what caused it to drop. The brake-shoe itself was standing on end right at—in the point of the frog—the lower end of the brake-shoe was."

It is sought to hold the defendant McAdoo liable in damages for having "negligently and carelessly furnished to the Star Coal Company said car in a defective condition," resulting in the injury and death of decedent. The defendant pleaded, and at the trial sought to prove, that at the time of the accident the decedent was an employee of the coal company and was injured in the regular course of his employment; that the coal company had fully complied with the provisions of, and was operating under, plan No. 3 of the Workmen's Compensation Act, and that decedent was bound thereby; further, that after the death of the decedent, his dependents, consisting of his widow and children, made application to the Industrial Accident Board for compensation, and actually received the sum of $75 for funeral expenses, the sum of $80 for support, and finally received and accepted a full lump sum settlement of $3,300 in satisfaction of all claims and demands against the state on account of the death of the deceased; that, having elected to take compensation under the Workmen's Compensation Act, the dependents of the deceased, as well as his administrator, are estopped to claim additional compensation from the defendants.

As a part of the plaintiff's case, the widow of the deceased on the stand admitted that she had made application for and received compensation from the Industrial Accident Board on account of the death of her husband; and by stipulation of the parties it appears that both the coal company and the deceased were subject to the provisions of the Workmen's Compensation Act at the time of the accident.

The sufficiency of the complaint to state a cause of action was raised by objection made by the defendants at the outset of the trial to the introduction of any evidence by the plaintiff in support thereof. Motions for a nonsuit and for a directed verdict were both denied. The jury returned a verdict in plaintiff's favor in the sum of $20,000, upon which judgment was regularly entered.

Although many errors are assigned by the defendant, in [1] our opinion, the determinative question is: Are the provisions of the Workmen's Compensation Act exclusive as to damages for an accident resulting in death of an employee at the plant or premises of his employer, or may the widow and dependents of the injured employee collect under the Act and at the same time a right of action survive in the administrator of the decedent's estate?

The Workmen's Compensation Act was enacted by the Fourteenth Legislative Assembly, and first appeared as Chapter 96 of the Laws of 1915. The Act, with amendments since made, which amendments are not pertinent to the subject under consideration, now appears as sections 2816 to 3033 of the Revised Codes of 1921. For convenience, reference will be made herein to the provisions of the original enactment.

The question presented on this appeal has not been heretofore directly considered by this court, although the statute covering workmen's compensation has been construed and considered in many other respects. (*Lewis & Clark County* v. *Industrial Acc. Board,* 52 Mont. 6, L. R. A. 1916D, 628, 155 Pac. 268; *Shea* v. *North Butte Min. Co.,* 55 Mont. 522, 179 Pac. 499; *Page* v. *New York Realty Co.,* 59 Mont. 305, 196 Pac. 871.)

The following extracts from the Act having a bearing upon the subject are here set forth, as a reference to their provisions is necessary for a correct determination:

"Sec. 3(a). In an action to recover damages for personal injuries sustained by an employee in the course of his employment, or for death resulting from personal injuries so

sustained, it shall not be a defense: (1) That the employee was negligent, unless such negligence was willful; (2) That the injury was caused by the negligence of a fellow-employee; (3) That the employee had assumed the risks inherent in, incident to, or arising out of his employment, or arising from the failure of the employer to provide and maintain a reasonably safe place to work, or reasonably safe tools, or appliances.'' (Sec. 2836, Rev. Codes 1921.)

''Sec. 3(c). Any employer who elects to pay compensation as provided in this Act shall not be subject to the provisions of section 3(a), nor shall such employer be subject to any other liability whatsoever for the death of or personal injury to any employee except as in this Act provided; and, *except as specifically provided in this Act, all causes of action, actions at law, suits in equity, and proceedings whatever, and all statutory and common-law rights and remedies for and on account of such death of, or personal injury to, any such employee are hereby abolished;* provided, that section 3(a) shall not apply to actions brought by an employee who has elected not to come under this Act, or by his representatives, for damages for personal injuries, or death, against an employer who has elected to come under this Act.'' (*Id.,* sec. 2838.)

''Sec. 3(d). Where both the employer and employee have elected to come under this Act, the provisions of this Act shall be exclusive, and such *election shall be held to be a surrender by such employer and such employee of their right to any other method, form, or kind of compensation, or determination thereof, or to any other compensation, or kind of determination thereof, or cause of action, action at law, suit in equity, or statutory or common law, right, or remedy, or proceeding whatever, for or on account of any personal injury to or death of such employee, except as such rights may be hereinafter specifically granted;* and such election shall bind the employee himself, and in case of death shall bind his personal representative and all persons having any right

or claim to compensation for his injury, or death, as well as the employer. * * * '' (*Id.*, sec. 2839.)

The Act is made applicable to all inherently hazardous works and occupations within this state (sec. 4[c]; *Id.*, sec. 2847), including the operation of coal mines (sec. 4[e]; *Id.*, sec. 2849).

"Sec. 6(j). 'Employee' and 'workman' are used synonymously, and mean every person in this state, including a contractor other than 'an independent contractor,' who, after July 1, 1915, is engaged in the employment of an employer carrying on or conducting any of the industries classified in sections 4(a), 4(b), 4(c), 4(e) and 5 of this Act, *whether by way of manual labor or otherwise,* or whether upon the premises or at the plant of such employer, or who is engaged in the course of his employment away from the plant of his employer: Provided, however, * * * if the injury to a workman occurring away from the plant of his employer is due to the negligence or wrong of another not in the same employ, the injured workman, or, if death results from such injury, beneficiaries or dependents, as the case may be, shall elect whether to take under this Act or seek a remedy against such others; such election shall be made in advance of the commencement of the action." (Subd. 1); *Id.*, sec. 2863.)

"Sec. 6(jj). 'The plant of the employer' shall include the place of business of a third person while the employer has access to or control over such place of business for the purpose of carrying on his usual trade, business, or occupation." (*Id.*, sec. 2889.)

In the absence of such legislation, or a compliance with its provisions, a person injured, or his personal representatives, in case of his death, may maintain an action against anyone negligently occasioning the injury. In case of death from the injuries received we have a survival statute (*Id.*, sec. 9086) and also an Act conferring an independent right of action upon the heirs of the deceased for injury and damages sustained by them (*Id.*, sec. 9076). These independent rights of

action are not directly or impliedly repealed by the Compensation Act, and only such causes of action are affected thereby as come within its specific provisions. (*Page* v. *New York Realty Co., supra.*)

As is well said by Mr. Chief Justice Brantly, speaking for this court: "The theory of such legislation is that loss occasioned by reason of injury to the employee shall not be borne by the employee alone—as it was under the common-law system—but directly by the industry itself and indirectly by the public, just as is the deterioration of the buildings, machinery, and other appliances necessary to enable the employer to carry on the particular industry." (*Shea* v. ·*North-Butte Min. Co., supra.*)

And Mr. Justice Holloway said for the court in *Lewis and Clark County* v. *Industrial Acc. Board, supra*: "Compensation laws proceed upon the theory that the injured workingman is entitled to pecuniary relief from the distress caused by his injury, as a matter of right, unless his own willful act is the proximate cause, and that it is wholly immaterial whether the injury can be traced to the negligence of the master, the negligence of the injured employee or a fellow-servant, or whether it results from an act of God, the public enemy, an unavoidable accident, or a mere hazard of the business which may or may not be subject to more exact classification. * * * In drafting this measure and formulating a title for it, we must assume that the members of the legislative assembly appreciated the fact that they were departing from the rule of liability in favor of the few, to establish a rule of compensation for injured workmen generally—one which would insure relief without reference to the question of fault and altogether irrespective of whether, under existing laws, actions for damages would lie."

The decisions from all the jurisdictions reiterate the statement that the object of such measures is to impose upon certain hazardous industries the burden of injuries resulting from them. So far as our examination goes, there are three

jurisdictions in which the compensation Acts make a distinction between injuries occurring at the plant and those occurring away from the plant, resulting from the negligence of a third person. These are Washington, Oregon, and Montana. The Washington and Oregon Acts are practically identical with our Act upon this point.

The Washington Act was first interpreted in the case of *Peet* v. *Mills,* 76 Wash. 437, Ann. Cas. 1915D, 154, L. R. A. 1916A, 358, 136 Pac. 685. In that case the plaintiff, while in the employ of a railway company, was injured in a collision. The defendant was president of the company, and it was sought to hold him personally responsible for the injuries received because of his negligence in failing to install a proper signal system. The court held that, inasmuch as the plaintiff and the company employing him were both under the Compensation Act, there was no cause of action against the defendant. In the course of its opinion the court says: "Starting with these basic principles, the conclusion is evident that, in the enactment of this new law, the legislature declared it to be the policy of this state that every hazardous industry within the purview of the Act should bear the burden arising out of injuries to its employees, and that it was the further policy of the state to do away with the recognized evils attaching to the remedies under existing forms of law and to substitute a new remedy that should be ample, full and complete, reaching every injury sustained by any workman while employed in any such industry, regardless of the cause of the injury or the negligence to which it might be attributed. We can conceive of no language the legislature might have employed that would make its purpose and intent more ascertainable than that made use of in the first section of the Act. To say, with appellant, that the intent of the Act is limited to the abolishment of negligence as a ground of action against an employer only is to overlook and read out of the Act and its declaration of principles the economic thought sought to be crystallized into law that the industry itself was the primal cause of the injury, and, as such, should be made to bear its

burdens.'' Thereafter the question arose in the federal court
in Washington in the case of *Meese* v. *Northern Pac.* (D. C.),
206 Fed. 222, which case followed the decision of the supreme
court of the state, but the case later went to the circuit court
of appeals and was reversed in 211 Fed. 254, 127 C. C. A.
622. This case was later appealed to the supreme court of
the United States (239 U. S. 614, 60 L. Ed. 467, 36 Sup. Ct.
Rep. 223), and the supreme court reversed the circuit court of
appeals, and affirmed the view taken by the supreme court
of the state of Washington in *Peet* v. *Mills* and by the federal
district court in the *Meese Case.* In its decision the supreme
court says that the interpretation placed upon the statute by
the Washington court is in no way in conflict with the equal
protection clause of the Fourteenth Amendment.

In the *Meese Case* the federal district court, in sustaining
a demurrer to plaintiff's complaint, said: ''In this case the
complaint shows that the deceased was, giving the ordinary
meaning to the words—killed, not 'away from,' but at, the
plant of his employer. Sections 3 and 5, in classifying these
injuries by the place where they occur, both contain the ex-
pression 'whether upon the premises or at the plant or, he
being in the course of his employment, away from the plant
of his employer.' 'At the plant' may include less or more
than 'on the premises,' depending on the relative extent of the
two; but these two expressions show an intention not to limit
the application of the law to real property boundaries. The
proviso, expressly preserving the right of action at law for
the death of an employee, resulting from an injury 'occur-
ring away from the plant of the employer,' clearly shows an
intent to except from that provision of the Act abolishing all
private controversies and all rights of civil action, what, but
for such provision, would have been abolished, and, as the
right of civil action is alone preserved when the injury occurs
'away from the plant of the employer,' then it is not pre-
served, but is abolished, when it occurs at the plant of the
employer.''

In the case of *Stertz* v. *Insurance Co.,* 91 Wash. 598. Ann. Cas. 1918B, 354, 158 Pac. 260, the court said: "With the whole section before us we perceive that, when a workman is injured off the premises by a stranger, he must elect whom he shall sue, and that no electing is imposed on him when he is injured by a third person upon the premises. Of the latter situation nothing is said. Now, from this silence one of four things must be true. Either when thus injured on the premises he has no right whatever to collect from the fund, or he has the right to collect from both the fund and the stranger, or only from one and then with waiver as to the other, or lastly only from one without waiver. The second conclusion is grossly improbable; the third would unfairly make him elect at his peril; the last, plausible, is illogical, for, since he has to elect when the third person injures him off the premises, why not when injured upon them, too? What possible reason for the right or necessity in one case and not in the other? Nothing answers this satisfactorily, except the first conclusion, that, when injured upon the premises, only one defendant is possible."

Since the decision in the *Peet Case* the matter has been before the Washington supreme court at least three times, and the court in each instance has affirmed its former ruling. The cases are *Ross* v. *Erickson,* 89 Wash. 634, L. R. A. 1916F, 319, 155 Pac. 153; *Carlson* v. *Mock,* 104 Wash. 691, 173 Pac. 637, 176 Pac. 2; *Zenor* v. *Spokane etc. Co.,* 109 Wash. 471, 186 Pac. 849. Elaborate notes discussing the question and citing many cases will be found in 19 A. L. R. 766 to 797; L. R. A. 1917D, p. 80; L. R. A. 1917F, p. 1043; L. R. A. 1918F, p. 524.

Independent of the decisions from other states, we think our statute is plain and unambiguous. The legislature has made declaration of the law governing the measure of compensation as to cases falling within the provisions of the Act, and such provisions are exclusive and must be strictly followed. The statute declares that the employer who elects to come within the provisions of the Act shall not be subject to any liability whatsoever for death or personal injury of an

employee except as in the Act provided, and that all "causes of action, actions at law, suits in equity, and proceedings whatever, and all statutory and common-law rights and remedies" for or on account of injury or death of an employee, are "abolished." (Sec. 3(c).)

And the provisions of the Act are made *"exclusive,"* and an election made by the employer with the consent or without objection of the employee is declared to be a *surrender by the employee "of their right by any other method, form, or kind of compensation, or determination thereof, or to any other compensation, or kind of determination.* \* \* \* *or cause of action, action at law, suit in equity, or statutory or common-law, right, or remedy, or proceeding whatsoever, for, or on account of, any personal injury to, or death of such employee, except as such rights may be hereinafter specifically granted."* (Sec. 3(d).)

The only exception contained in the statute thereafter "specifically granted" is in instances where the workman is injured "away from the plant of his employer due to the negligence or wrong of another not in the same employ," in which instance the injured employee or his beneficiaries or dependents are given the right of election to take compensation under the Act or to seek a remedy against the third person to whose negligence is ascribed the injury or death of the employee, which election must be made in advance of the commencement of any action. (Sec. 6 (j), subd. 1.)

The Act is declared to be applicable to all hazardous employments, "whether upon the premises or at the plant of such employer" or away from the plant (sec. 3[d]); all other remedies are abolished (sec. 3[c]). Our legislature has expressly declared the Act to be exclusive in compensation for all injuries arising under its provisions; *provided only* that, when an employee is injured away from the plant or premises of the employer through the negligence of a third person, he shall have a right of election whether to take under the Act, or hold such third person to respond in damages. He must make the election before he can maintain action against

such third person. This single exception made in the Act conclusively demonstrates its exclusive character in all other cases.

Thus it will be seen that the Compensation Act is "*exclusive*," and the only other right of action or remedy of the injured employee exists in instances where the accident is occasioned by the negligence of a third party away from the plant or premises of the employer, in which instance alone the employee or his dependents or beneficiaries, in case of his death, are given the right of "*election.*" The reason for this distinction made by the legislature appears to us to be that, as to accidents occurring at the plant or on the premises of the employer, the employer is responsible, and is to be afforded absolute protection under the Compensation Act, having complied therewith. Being in actual possession of his own plant or premises, and in direct charge of all employees, he is at least theoretically responsible for accidents occurring thereon. If this be not the correct construction of the language employed, then the Act is not, as declared, "*exclusive,*" and a "surrender by the employer and employee of any other method, form or kind of compensation or determination."

In the case under consideration the freight-car furnished the coal company was simply an instrumentality employed [2] by it at its plant in connection with its coal mining operations, used and handled by its employee. The car, under the facts stated, was in the exclusive possession and control of the coal company, at least for the time required to load it. There can be no distinction on principle between a wagon thus delivered to the coal mining operator or teams and wagons so furnished by individual residents in the community to be used by the coal company on its premises, there to be loaded with coal and afterwards removed by such individual owners; and surely, if the claim of right of action were transferred to the shoulders of a resident farmer in the community so furnishing wagons, no one would be heard to seriously urge responsibility on the part of the owner of such wagon in con-

sequence of a defective brake, by reason of which an employee of the coal company was injured in connection with the operations of the employer in loading such wagons with coal. A mere statement of these facts is indicative that the claim in this instance is predicated alone upon the fact that the defendant McAdoo was in charge of the operations of a large railway corporation.

The general rule announced by various text-writers on the subject is in accord with the views herein expressed. (28 R. C. L. 739; Harper's Workmen's Compensation, sec. 239.) We must interpret and declare the law as we find it. If remedy is necessary, the legislature will give the subject attention. The dependents of the decedent being bound by the Compensation Act, an independent action cannot be maintained by the administrator of his estate under the survival statute.

The judgment and order are reversed, and the cause is remanded to the district court of Musselshell county, with directions to dismiss the complaint.

*Reversed and remanded.*

ASSOCIATE JUSTICES HOLLOWAY and COOPER concur.

MR. JUSTICE FARR, being disqualified, takes no part in the foregoing decision.