237 P.2d 102

**MIERA v. GEORGE.**

**MIERA v. JOE HEASTON OIL CO.**

**No. 5417.**

Supreme Court of New Mexico.

Nov. 1, 1951.

W. T. O'Sullivan, Lorenzo A. Chavez, Joseph L. Smith, Albuquerque, for appellant and appellee Stephen Maurice Miera.

H. Leslie Williams, Albuquerque, for appellant Charles A. George.

Gilbert & Gilbert, Santa Fe, for appellee Joe Heaston Oil Co.

McGHEE, Justice.

Miera sued George and the Joe Heaston Oil Company to recover for damages caused by an assault upon him by George on November 27, 1948, when, it was claimed, the latter was an employee or agent of the oil company.

The jury returned a verdict against George and the oil company for $20,000 compensatory damages, and against George

for $5,000 punitive damages. Following the return of the verdict the trial court granted the oil company judgment notwithstanding the verdict, and the plaintiff has appealed therefrom. George has also appealed from the judgment, asserting he was prejudiced by being joined with the oil company, and that by reason thereof the jury returned a larger verdict of compensatory damages than would have been awarded absent the corporate defendant.

We will first consider the appeal of Miera against the oil company.

The grounds of the motion of the oil company were:

1. That there is no competent evidence on which the jury could hold that the defendant George was in the employment of or was the agent of the Joe Heaston Oil Company.

2. That all of the evidence introduced shows that the defendant George was not an employee or an agent of the Joe Heaston Oil Company at any material time.

3. That if there be any evidence whatsoever as to any agency or employment relationship between the defendant George and Joe Heaston Oil Company at any material time, the plaintiff's proof still fails to show that defendant George was acting within the course of his employment in making the claimed attack upon the plaintiff for each of the following reasons:

First, that there is no evidence from which a jury might reasonably find that the nature of any claimed employment of Mr. George was such as would in natural or reasonable sequence result in any physical violence as between the defendant George and any third persons; and, second, that there is no evidence whatsoever from which it could properly be found or held by the jury that the defendant George in making the claimed assault upon Miera was acting on behalf of or in furtherance of the business of Joe Heaston Oil Company.

█ In our consideration of the claim that the trial court erred in granting the motion of the oil company for judgment notwithstanding the verdict we will follow the rule stated in Michelson v. House, 54 N.M. 197, 218 P.2d 861, that the evidence favorable to Miera, together with the inferences that may reasonably be drawn therefrom, is to be accepted as true. Such evidence is summarized as follows:

On May 1, 1948, George leased the filling station where the assault occurred from the oil company. Prior thereto and while the oil company was operating the station it sold a battery to Miera which carried a guarantee of 18 months' service. On the day of the assault, November 27, 1948, the battery would not start the motor in Miera's car; he called a telephone number listed under Joe Heaston Oil Company and George answered and was advised of

the condition of the battery. (The telephone, which was the Heaston companies' night number, had been left in the station under an arrangement whereby George picked up and towed wrecked cars at night for the Heaston Body Works, a separate corporation.) Miera was then told to come down so an adjustment could be made.

Upon Miera's arrival at the filling station he parked his car in front of the wash rack as directed by George. Miera killed the motor so the battery could be tested, with George's promise that he would start the motor. A test showed two of the battery cells were dead. The question then arose as to when the battery had been sold and whether by George or the Joe Heaston Oil Company which operated the station before May 1, 1948. Miera had been carrying a Joe Heaston Enterprises' credit card for some time and it was agreed that the books of the oil company would show the date of purchase if that company had sold it. Miera handed the credit card to George who took it to the oil company. A check of its books showed the battery had been purchased from the oil company, and George was authorized to make an adjustment on the basis of a little more than $11 for a new battery, but was advised he could only accept cash as Miera was delinquent in his account with the oil company and it was retaining the credit card. George then returned to the filling station and advised Miera of his conversation with the person in charge of the oil company office.

Miera was dissatisfied with the proposed adjustment put finally announced he would accept it, but he refused to pay cash, and when told that was the only way he could get a new battery he demanded that George charge the battery without cost to him so the car could be driven away, but George refused the demand.

Miera and George got into a quarrel over the adjustment, the taking-up of the credit card by the oil company and the refusal of George to charge the battery without cost to Miera during which Miera freely expressed his opinion of the Joe Heaston companies. George told Miera to get his car out of the station and when the latter refused, George called to his employees to help him push the car across the street. Miera objected to this proposed action and George then struck him on the head with a tire tool, inflicting serious injuries upon him.

After George took over the operation of the filling station, when former customers who had purchased tires or batteries there brought them back for an adjustment, he would tell an employee or officer of the oil company of the defects and it, in turn, would advise him of the adjustment he could make on the purchase of a new tire or battery. If the customer accepted the offer, George would go to

the Heaston company as directed and pick up a new tire or battery, or the Heaston company would deliver a new one at the station. In either event George would install it without charge to Heaston or the customer. This service was provided by George, as he testified, to build good will for his station.

■■ In the case of Childers v. Southern Pac. Co., 20 N.M. 366, 149 P. 307, 308, which was an action for assault by a railroad watchman, this court stated:

"It has been held, in a great variety of cases, that the master is liable for the wanton or malicious acts of his servant if they were committed while the servant was acting in the execution of his authority and within the course of his employment. Mechem on Agency (2d Ed.) § 1960; Elliot on Railroads, § 1265. Some of the earlier cases, it is true, announced the contrary rule; but this doctrine no longer prevails. The difficult question is to determine what acts may be deemed to be within the course of the servant's employment, within the meaning of the rule. Mechem on Agency, § 1960, states the rule as follows:

" 'But in general terms it may be said that an act is within the "course of employment" if (1) it be something fairly and naturally incident to the business, and if (2) it be done while the servant was engaged upon the master's business and be done, although mistakenly or illadvisedly, with a view to further the master's interests, or from some impulse of emotion which naturally grew out of or was incident to the attempt to perform the master's business, and did not arise wholly from some external, independent, and personal motive on the part of the servant to do the act upon his own account.' "

In that case the railroad watchman had instructions to prevent people stealing rides on its trains. He mistakenly thought Childers was about to steal a ride on a train then standing in the railroad yards and assaulted him. The court stated as it was a part of the duties of the watchman to prevent the stealing of rides, he was engaged in the business of the master when he committed the assault, and the employer was liable.

■ The rule is stated in Restatement of the Law, Agency, Sec. 245, as follows:

"Use of Force.

"A master who authorizes a servant to perform acts which involve the use of force against persons or things, or which are of such a nature that they are not uncommonly accompanied by the use of force, is subject to liability for a trespass to such persons or things caused by the servant's unprivileged use of force exerted for the purpose of accomplishing a result within the scope of employment.

"*Comment:*

"a. *Nature of employment.*. Whether or not an employment involves or is likely to lead to the use of force against the person of another is a question to be decided ·upon the facts of the individual case. To create liability for a battery by a servant upon a third person, the employment must be one which is likely to bring the servant into conflict with others. The making of contracts or the compromise, settlement, or collection of accounts does not ordinarily have this tendency. On the other hand, the employment of servants to recapture property, to take possession of land, or to deal with chattels which are in the possession of another, is likely to lead to altercations, and the master may become liable, in spite of instructions that no force shall be exerted against the person of the possessor.

"*Illustrations:*

"1. A is employed by P to make installment collections and to report back to P whenever a debtor fails to pay. A, failing to make a collection from T, snatches a pocketbook from T's hand, taking therefrom the correct amount and returning the balance. For this assault, in the absence of further facts, P is not liable to T.

"2. Same facts as in Illustration 1, except that A uses force to recapture chattels previously sold by P to T. In the absence of further facts P is not liable to T for this assault.

"3. P employs A to repossess goods sold by P to T, directing A to use no force whatever but to take the goods only if voluntarily surrendered. T refuses to surrender the goods and A takes them by means of force directed against T's person. P is subject to liability for the use of such force."

◼ In this case the extent of the authority conferred on George was to advise Miera of the amount for which he could purchase a new battery for cash, and to procure and install such battery if Miera accepted the offer.

The case of Moskins Stores, Inc., v. DeHart, 217 Ind. 622, 29 N.E.2d 948, 949, is applicable to the present case. There a collector attempted to collect an account, the debtor declined to pay and an altercation followed in which the debtor was choked by the collector. Judgment was entered for the debtor against the employer of the ·collector. The judgment was reversed, the court saying, among other things: " * * * The mere fact that the appellant is a corporation selling wearing apparel on credit, and that it employed regular collectors, and that it sought to collect its accounts promptly, is not sufficient. In order to hold the master for an assault and battery by a collector, it

is necessary to show that the use of force was contemplated or usual in the conduct of the master's business of collecting accounts, or that the master knew, or had reasonable cause to know, that the servant was the type of person who was likely to resort to force in the course of his efforts to collect the accounts. No such facts were alleged or proven. The case was tried upon the theory that the mere fact that the assault and battery was committed in an effort to collect the account is sufficient to charge the employer with responsibility. While the authorities differ, we conclude that the sounder reasoning does not sustain such a theory." See also Barney v. Jewell Tea Co., 104 Utah 292, 139 P.2d 878, and the specially concurring opinion.

In this case George had made other adjustments for the oil company, but there is no evidence he ever had trouble with the customers in handling the adjustments; nor is there anything in the record to put the oil company on notice that he might become involved in an altercation with its customers.

Miera asserts the oil company ratified the assault on him by retaining the credit card when it was brought to the office by George to determine who had sold the battery, as well as by the statement of the president of the oil company to Miera at the hospital that he, the president, would see that everything would be paid at the hospital and his later statement that he could not pay it but would make Miera a personal loan.

The credit card was retained because Miera was delinquent in his account and his credit stopped, but it must be remembered he voluntarily sent it to the office of the oil company. No force or artifice was used by George to get possession of it. We cannot hold the retention by the oil company of the credit card constitutes ratification of the unlawful and unauthorized assault on Miera.

Neither can we hold the statement of the president of the oil company that the hospital bill would be taken care of constitutes ratification on behalf of the company. Even if such act constituted ratification, it is not shown the president had authority to so bind the company, and absent such a showing it is not bound. Burguete v. G. W. Bond & Bro. Mercantile Co., 43 N.M. 97, 85 P.2d 749.

We are of the opinion the trial court acted correctly in granting judgment notwithstanding the verdict for the Joe Heaston Oil Company. Its action in that regard is affirmed.

Turning now to the appeal of George, he states his contention as follows: "The only issue presented by this appeal is whether, after a verdict against two dedendant joint tort-feasors, the court should,

in order to obtain justice for all, grant a new trial to one defendant, assuming there was no error committed in the trial against that defendant, while at the same time setting aside the verdict as to the other defendant."

■ It was the rule of the common law that a verdict set aside as to one joint tortfeasor was set aside as to all. This court, however, in New Mexico & S. P. R. Co. v. Madden, 7 N.M. 215, 34 P. 50, and Union Trust Co. of New York v. Atchison, T. & S. F. R. Co., 8 N.M. 159, 42 P. 89, adopted the modern rule that the court may grant a new trial as to one of several defendants and affirm as to the others. George does not question the wisdom of the rule but attempts to bring himself within one of the exceptions thereto which is set out in 39 Am.Jur.Supp. 9, New Trial, Sec. 25, as follows: " * * * The principal qualification of the modern rule, recognized by the courts as early as the inception of the rule itself, requires the grant of a new trial to all the defendants, if a new trial is granted to one defendant for error committed as to him, where under the circumstances of the case it becomes apparent that the jury would not have rendered the verdict it did if it had anticipated that the final discharge of the liability incorporated therein as against all the defendants would, by future action of the court, be placed solely upon the other defendant, or that it would not have rendered the verdict it did if such defendant had been sued alone instead of in conjunction with the other codefendants, the idea being that, in such case, failure to grant a new trial as to all the defendants, including the defendant as to whom no error was committed, would work an injustice upon the latter."

In support of his position George cites the following authorities: Washington Gaslight Co. v. Lansden, 172 U.S. 534, 19 S.Ct. 296, 43 L.Ed. 543; Albright v. McTighe, C.C., 49 F. 817; Dollar Steamship Lines v. Merz, 9 Cir., 68 F.2d 594; Courtney v. American R. Exp. Co., 120 S.C. 511, 113 S.E. 332, 24 A.L.R. 128; Sweatman v. Linton, 66 Utah 208, 241 P. 309; Harrington v. H. D. Lee Mercantile Co., 97 Mont. 40, 33 P.2d 553, 560 and Annotation in 143 A.L.R. 31.

In order to more fully develop the extent of this exception to the modern rule and the basis therefor, there follows hereafter a summary of the facts which appear to have caused the courts to apply the exception in the cases above cited.

In the Washington Gaslight case, an officer of the company had written a libelous article about a former official of the company. The company and the officer were joined in an action for damages. Punitive damages were sought and evidence was introduced showing the company had a capital stock of $2,000,000 and had

been paying annual dividends of from $400,000 to $600,000. The jury returned a substantial verdict against both defendants. The judgment against the company was reversed with instructions to dismiss as to it. The court was satisfied the jury would not have granted such a large verdict against the individual had he not been joined with the gas company, so a new trial was awarded him.

The Albright case was an action against a partnership for false imprisonment and malicious prosecution. All partners were sued and all were supposed to be equally guilty. Evidence was admitted of the financial ability of each defendant to respond in damages. After the trial it was discovered one defendant had withdrawn from the partnership before the commission of the torts by his former partners. The trial judge said it was a close question but he felt the jury must have been influenced by the fact three defendants were to pay the judgment and that evidence respecting their financial worth had been admitted.

In the Dollar Steamship Lines case the court took notice of the rule but stated the district court completely lacked jurisdiction to hold the former trial.

In the Courtney case the appellate court applied the rule of the Washington Gaslight case, and it is not indicated there was any testimony as to the financial worth of the American Railway Express Company which secured a reversal for the reason its Route Agent was not acting within his authority when he uttered the slanderous statements against Courtney. It is not unlikely the court took judicial notice of the fact the express company is one of our major corporations operating the express business on all of our railroads.

In the Sweatman case, which was an action for malicious prosecution and false imprisonment, the court reversed the judgment as to the defendant Nuckoll Packing Company with instructions to dismiss as to it, and granted the individual defendant a new trial, stating the trial court permitted incompetent testimony to be introduced tending to establish that the real party responsible for the arrest and prosecution of the plaintiff was the packing company. The court felt the jury was likely influenced in arriving at the amount of its verdict by the presence of the packing company as a defendant and the testimony mentioned.

In the Harrington case the Montana Court applied the rule of the Washington Gaslight case when it reversed as to the corporate defendant and directed a dismissal as to it in that it also awarded a new trial as to the individual defendant. The individual defendant was a traveling salesman who worked on commission and furnished his own car. He and his fiancee had spent an evening some distance from her home dining and dancing and when they

were returning home the car crashed into a guard rail and the lady was killed. Her administrator joined the employer and the driver of the car in an action for damages and a verdict for $18,000 was returned against both. On appeal it was held the employee was on a personal mission and the employer was not liable. It is stated in the opinion the worth or size of the company was not established but it was shown to be a large concern with offices or plants from coast to coast, and that this knowledge probably influenced the jury in its award of damages which, the court stated, was excessive. It is also stated: "To say the most, the case against him hangs by a thread." One justice dissented, saying the case against the individual defendant should be affirmed.

Miera was forty-one years of age, a graduate of the New Mexico Agricultural and Mechanical College with a degree in civil engineering. He was also a licensed surveyor and in addition to doing some surveying, he was operating a small grocery store and filling station on North Fourth Street in Albuquerque and was deriving a monthly income of $300 to $350. He had a wife and six children who, since his injury, have been operating the store and filling station. He was in the hospital approximately six days and was then confined to his bed at home for five months, and at the time of the trial, December 20, 1950, had not been able to do any work.

He had since 1945 suffered infrequent attacks of epilepsy, ideopathic type, which following his injury, changed to Jacksonian type and occurred frequently, due according to the medical expert who attended him, to a brain concussion caused by the blow inflicted by George.

It is true the testimony showed the Joe Heaston Oil Company was a corporation engaged in the wholesale oil and gasoline business, and that there were several other corporations in business in Albuquerque which carried the Heaston name, but there was no evidence as to the worth of any of these corporations or their earnings. Neither do we have any claim that the damages awarded were excessive for the injury inflicted and the results which followed. Had the jury denied punitive damages or granted only a small amount we might be persuaded it allowed compensatory damages of $20,000 because of the belief that part of the damages, if not all, would be paid by the corporation; but here we have an award of punitive damages of $5,000 which could well cause the belief that it was the oil company which had the large verdict returned against it because of its joinder with George under the facts in this case. The assault upon Miera was vicious, the injuries were very severe and we do not believe under the facts in this case that George is entitled to a new trial.

The judgment granted Miera against George will be affirmed, and the prevailing parties on this appeal will recover their costs.

It is so ordered.

LUJAN, C. J., and SADLER, COMPTON and COORS, JJ., concur.