283 P.2d 623

**Roy THOMPSON, Plaintiff-Appellant,**

**v.**

**Lillard DALE and Thurman Dale, Co-Part-**
**ners, d/b/a Dale Bros., Defendants-**
**Appellees.**

**No. 5867.**

Supreme Court of New Mexico.

May 4, 1955.

Rehearing Denied May 31, 1955.

Jack Underwood, Lovington, Whatley & Oman, Las Cruces, for appellant.

Robert W. Ward, Lovington, Neal & Girand, Hobbs, for appellees.

SADLER, Justice.

The appellant, who was plaintiff below, sought damages for personal injuries suffered while working as a farm hand for the defendants. At the close of his case, the trial court sustained a motion by defendants for a directed verdict in their favor and rendered judgment accordingly. It is to review such judgment that plaintiff prosecutes this appeal. The parties will be designated as they were below.

The defendants are brothers and at all material times were engaged as partners in farming and ranching in Lea County, New Mexico, under the firm name of Dale Brothers. The plaintiff, a farm and ranch laborer, was employed by them as a general farm hand at $40 per week, plus a house, utilities and a cow. While so employed on December 29, 1953, and engaged in performing the duties of his employment, namely, the grinding of alfalfa in a hammermill, he either slipped or fell thrusting his right arm into the moving blades of the hammermill completely severing the three large fingers of the right hand, and the tip of the thumb and of the little finger.

It was the plaintiff's contention that the fall and resultant thrusting of his right arm into the blades of the machine was due to the negligence of defendants in failing to provide him a safe place to work in that the platform on which he was required to work in feeding the hammermill was rough and uneven, containing loose boards and was covered with loose feed; that the platform lacked guards for plaintiff's protection and the hammermill was located near a leaky hydrant by reason whereof the platform and surrounding terrain became wet and muddy, slick and dangerous.

On the occasion in question, the plaintiff was engaged in grinding alfalfa for calf feed. He was using a John Deere Tractor for power and a Wetmore Clipper hammermill to do the grinding. The hammermill was located or mounted on skids and boards. It was placed only a small distance from a granary. Plaintiff was taking the hay from another workman standing on a nearby truck who clipped

the baling wire and passed the hay to plaintiff who fed it into the mill. The blades then ground it and discharged it through the chute into the barn. There was also a pumphouse close by from which a drainage ditch ran and a hydrant protruding from the pumphouse from which water was leaking from time to time. Cotton pickers at work on the farm used this hydrant for their water which created a somewhat wet and muddy condition around the mill, so much so in fact that the plaintiff was compelled to wear overshoes while at work.

· The slightly elevated platform on which the mill was located was made of loose boards of uneven length and rough from the hammermill being dragged around from place to place. But to give the picture as plaintiff described it in his testimony on direct examination. He testified:

"Q. What were your duties? A. To feed the mill.

"Q. Now, in order to feed that mill, where did you have to stand? A. Well, I started out on the west side of the mill, feeding from the west side, and then the wind was blowing awful hard—I mean it was really blowing. Well, the chaff and dust got so bad that I couldn't get my breath. I walked around to the east side which made me go to feeding at the right hand, and as I reached in there why

that's when the accident happened. Just when I reversed my sides is when the accident happened.

"Q. All right. When you changed sides, where did you have to walk? A. I had to walk completely around the truck.

"Q. Now, this platform on which the mill was mounted, was it shoved up right against the granary so that the ground grain was being discharged into the granary? A. No, sir, the platform wasn't right up against the granary. It was, I'd say, around anywhere from 18 inches to two foot, from the end of the platform up against the barn.

"Q. Where was the ground feed being discharged? A. It was being discharged in the barn. It run through the chute which the mill shows.

"Q. Now, what was the condition of the ground around this mill? A. Well, it was wet, muddy.

"Q. Why was it muddy? A. Because we had had cotton pickers there, and it was a pumphouse and that's where they had to get their water, and the water naturally was used. Water drained in the ditch from that. Our mill was sitting right up on this drain ditch. In other words, you couldn't get to the mill. If you stepped off the mill, if you didn't step

away back why you stepped in mud and water. If our mill was sitting in the truck, and you pulled that in there with the truck, why you had—you spun your wheels getting in or out, one.

"Q. Now, this water was coming simply from a hydrant sticking out the pump walls? A. That's right.

"Q. Did you say the cotton pickers there used it as a source of water? A. Yes, sir. That is true.

"Q. Now, moving from one side to the other, state whether or not you had to go through the mud? A. Well, no, I could step over the mud, and did step over it, going around the other side of the truck.

"Q. Well, did you? A. Well, I had been in the mud getting up backwards and forwards on my side, in other words, on the west side of the mill.

"Q. Were your feet muddy and slippery when you climbed up on the other side of that mill? A. Yeah, my overshoes was wet.

"Q. Now, what was the condition of this platform? A. Well, it was rough, rough on there. I mean it had been drug around and shook up and then patched in two or three places.

"Q. Now, this picture here, Plaintiff's Exhibit '1', which shows these rough boards on one side of the mill,

does that accurately portray the— were the boards on the other side of the mill in the same condition? Approximately in the same condition? A. Yes, sir. Yes, sir, they're approximately in the same condition.

"Q. Were they rough and uneven? A. They are rough and uneven, and just as the picture shows, they had been patched.

"Q. All right, now, tell the jury what happened when you changed sides and climbed up on the other side of the mill on the morning of December the 29th, 1953? A. Well, about all I can tell you, gentlemen, I come around the end of this truck because the wind had got so bad I couldn't grind from the west side which is the proper side to grind feed from. But it got so bad that I couldn't do it. We had about—I believe it was about 50 bales of hay on the truck, and I believe we had ground about eight or ten. I come around the end there and started to feed with my right hand. And I reached for a block of hay and this left leg broke away, slipped, and went out in under the truck and I fell, armlength, into this mill. Now, don't ask me how or why it didn't get more of my hand because I don't know. I don't know how I kept it from getting more of it.

"Q. How did you get out of the mill, Roy? A. Now, that is just something, Jack, that I can't honestly tell the jury. It was done so quick and fast that my hand was gone, and the only thing I remember was just a-running. I run from the time I went out—just as soon as I could possibly get my feet, I broke and run. And Mr. Dale was in the shop working and he didn't lose any time, none whatever, getting me to the hospital because he seen just as soon as I walked around that I didn't have any hand.

"Q. Were you hurting? A. No, I didn't hurt. I didn't hurt until around 3:30 that afternoon.

"Q. Did Mr. Dale take you right to the hospital? A. He take me right to the hospital, that's right.

"Q. And took you to what doctor? A. Dr. Gillette.

"Q. Did this mill have any sides on it of any kind? A. No, sir. There is no guards as far as I—I'm 46 years old and I have seen a lot of mills, and even seen a lot of old corn mills where they make corn in and meal, and I, as far as I'm concerned as what I've seen, there ain't such a thing as a guard on a hammermill. You've got your chute there all right, but the chute is only for one purpose: to keep the shaft out of your hand. The knives is wide open. You ain't got nothing but the table between you and the knives."

Continuing his testimony relative to conditions surrounding the place where he was working, the plaintiff had the following to say on cross examination:

"Q. You have had considerable experience doing farming and ranching work? A. Yes, sir. I've had a right smart of it.

"Q. That has been your principal occupation? A. That's right. That's been my principal work of my life is ranching, more so ranching than farming.

"Q. And your preference of the kind of work there is to do is ranching, handling cattle and such as that? A. That's right.

"Q. You have necessarily in that work ground lots of feed? A. I've ground a lot of feed and fed a lot of it.

"Q. On just any ranch or farm it is part of the work that has to be done? A. Yes, sir.

"Q. You went to work for the Dale Brothers along about August 22nd, 1953? A. Oh, I don't think it was that late, was it?

"Q. Now, if your first check was dated that day, is that when that would

be? A. Well, I guess it would be all right then.

"Q. And you were paid up to January 30, of 1954, by the Dale Brothers? A. That's right.

"Q. What were your duties out there on the—A. Well, just anything that come up.

"Q. Well, now the term 'ranch' has been used. This is primarily farm work, is it not? A. Yes, sir, I would say it was.

"Q. And you used the feed that was raised there to feed cattle as a means of disposing of it? A. Yes, sir.

"Q. How often had you had occasion to grind feed? A. Well, let me see, let me get the thing kinda' straightened out now. I'd say somewhere in the neighborhood of three weeks that we'd been grinding feed.

"Q. Somebody had to grind feed almost every day, didn't they? A. Well, I'd say every third day anyhow some feed had to be ground.

"Q. It was something that had to be done all the time. You say you are familiar with this kind of work with this type of equipment. Would you describe just how this feed mill was constructed? A. Well, about all—the only way I can tell you is just what I said a while ago. It was mounted on a—on boards—on skids that you hooked onto the tractor. You drug it everywhere you wanted it. Anywhere for handy use that's where you drug it. And, if boards was hittin' and drug, it was rough on it. It would be on any farm. And it was rough.

"Q. Those were 2 x 6's? A. I won't say whether it was 2 x 6's or 2 x 4's or 1 x 1's. I just know it's on a platform, and the platform is rough.

"Q. Incidentally, the power take-off was behind the feed mill, and the tractor supplying the power was behind it? A. It was east of it.

"Q. East of it. I hand you what has been marked Plaintiff's Exhibit '3', and it shows a slide and then a covered area or shield? A. Yeah.

"Q. How far was it from the edge of that shield down to the blades? A. Well, it was somewhere around just about the length of my arm. If it hadn't been, I'd a had more of my arm off than I did.

"Q. In other words, that shield was so long that you got all of your arm in that you could get in? A. Well, I figured I did. If ita' had any more, if it coulda' got any in there, I wouldn'a got this much of it.

"Q. So you had to stick your entire arm inside the shield in order to get your fingers in the blades? A.

There ain't but one way that you can get in there. You can fall in there. You can't get yourself right up there and grab down and reach it.

"Q. You couldn't do this? A. No, you gotta fall into it. That's the only way you can get into it.

"Q. And you know of no other safety guards or safety devices that could be put on that mill? A. There's not any.

"Q. You operated the mill. You could see the knives down there. You knew where they were? A. Why certainly.

"Q. You had—was this mill mounted in any way different than the ordinary mill? A. Well, there is several different mounts of this. Some come out on wheels, some come out on factory platforms, some of them is mounted on concrete. It's just according to what you use a mill for the way they're mounted.

"Q. They had hammers and nails out there at the Dale place, didn't they? A. Well, I imagine they did. They usually try to keep them.

"Q. If you had wanted to, you could have taken a hammer and nail and pounded down any of those boards? A. Oh, yeah, a man could. A man could have gone out there and hammered it down but he could have

ground the hay, too. The man said, 'Grind the feed.' He didn't say, 'Hammer it down.'

"Q. How long was that condition in existence? A. Oh, I don't know.

"Q. Did you ever complain about it to either of the Dale's? A. No, I never complain to nobody I'm working.

"Q. And you could see the condition there of the boards? A. Certainly."

And, again, the plaintiff dwelt upon conditions around the place where he worked:

"Q. You say that it was wet and muddy there at the place where this feed mill was located? A. Yes, sir.

"Q. There was a hose attached to that hydrant, wasn't there? A. No, sir.

"Q. When you went out there, you saw the mud? A. Yes, sir.

"Q. You had on your old overshoes? A. I sure did.

"Q. Mr. Dale never saw the condition of your overshoes? A. Well, I won't say that he did; I won't—I think that he did. He often had a man at his house. I had to wear house slippers at the times I was up to his house.

"Q. But, if those overshoes were muddy that morning, you knew about it and nobody else would necessarily

know that your overshoes were muddy? A. No, sir.

"Q. And, if your overshoes were slick, you knew about it and nobody else would necessarily know about that? A. Well, ain't that about right?

"Q. You didn't stop and clean the mud off your overshoes? A. No, sir.

"Q. You testified a while ago that it was proper to feed this feed mill from the west side. From a safety point of view, what difference does it make which side? A. It just seems natural. I don't know why. It's not any difference on one side than it is the other. It just seems more natural for a man to walk up on the west side of it. It's west side out there. It might be the east side or any side, but anyway you're supposed to feed it with your left hand.

"Q. But, facing toward the feed mill, you mean you would prefer feeding from the left-hand side? A. Yeah.

"Q. But that is just a matter of personal preference, isn't it? A. That's right, but I've never seen nobody feed it on the other side."

As to knowledge on defendants' part of the conditions under which he was working, the plaintiff on redirect testified:

"Q. Mr. Thompson, let me ask you if the Dale Brothers knew of this mud around the feed mill where you were working the morning of the 29th of December, 1953? A. Yes, sir.

"Q. One of them or—A. All three of them.

"Q. Let me ask you also, Mr. Thompson, if any of the Dale Brothers, and, if so, specify which one, knew of the rough conditions of the floor boards of this mill? A. Well, I have an idea that they knowed it but now as to answer you directly, to tell you the honest God's truth, I wouldn't say that they did or didn't because they had never mentioned it to me. They never said nothing to me about it, which now you know, as well as you know, if you got a rough floor board or something, or a floor in your house, you probably know you got it. So—

"Q. It was their mill? A. It was their mill.

"Q. Were they ever around where you were using the mill? A. Oh, yeah.

"Q. No reason why they shouldn't have seen it? A. No, sir."

The foregoing affords a fair picture of the evidence as it appeared when counsel for defendants interposed the motion for a directed verdict following plaintiff's announcement that he rested. The evidence

touching the extent of plaintiff's disability from the injury suffered is omitted from the recitation of the facts. It is not disputed that the disability suffered by one with the limited education of plaintiff, who is confined to manual labor for his earnings, is extensive and far reaching.

Thus it is that we are called upon to decide whether the plaintiff, in his middle forties, and an experienced farm laborer, established in the evidence a prima facie case which entitled him to take his case to the jury. If he did, it is on a single ground of negligence, namely, failure on the part of defendants to provide him a reasonably safe place to work. True enough, negligence was alleged in respect of an omission to provide proper guards for the hammermill. The plaintiff, himself, however, says he never saw one so equipped and the implication from his testimony is that any effort to supply guards would interfere with and handicap due operation of the machine.

■ As to the one ground of negligence, however, the omission and failure on defendants' part to provide plaintiff a reasonably safe place to work, we think evidence of primary negligence on the part of defendants was sufficient to take the case to the jury. Furthermore, we are not able to say, as a matter of law, that the plaintiff's cause of action is barred, either by reason of contributory negligence, or

assumed risk. We think it was a facts issue to be resolved by the jury; (a) whether the defendants were primarily negligent in the respect mentioned which contributed proximately to cause his injury; and (b) whether he either assumed the risk consequent on such negligence; or (c) was himself contributorily negligent in respect to defendants' omission to provide him a safe place to work.

■ Perhaps, before proceeding further, we should dispose of a contention made by plaintiff that defendants are denied the right to rely upon the common law defenses of assumed risk, contributory negligence and fellow servant by a certain section of the Workmen's Compensation Act. Of course, the one last mentioned, that of fellow servant, is excluded from consideration since there is nothing in the evidence to warrant that defense. The only occasion for even mentioning it is that it is listed along with the other two defenses which counsel for plaintiff say are denied to defendants under the language of 1953 Comp. § 59–10–5. It reads as follows:

"In an action to recover damages for a personal injury sustained by an employee while engaged in the line of his duty as such, or for death resulting from personal injuries so sustained in which recovery is sought upon the ground of want of ordinary care of the employer, or of the officer, agent or

servant of the employer, it shall not be a defense:

"(a) That the employee, either expressly or impliedly, assumed the risk of the hazard complained of as due to the employer's negligence.

"(b) That the injury or death was caused, in whole or in part by the want of ordinary care of a fellow servant.

"(c) That the injury or death was caused, in whole or in part by the want of ordinary care of the injured employee where such want of care was not wilful.

"Any employer who has elected to and has complied with the provisions of this act (59–10–1 to 59–10–31), including the provisions relating to insurance, shall not be subject to any other liability whatsoever for the death of or personal injury to any employee, except as in this act provided; and all causes of action, actions at law, suits in equity, and proceedings whatever, and all statutory and common-law rights and remedies for and on account of such death of, or personal injury to any such employee and accruing to any and all persons whomsoever, are hereby abolished except as in this act provided."

The language of the foregoing section, if read apart from its context, might very well yield to the construction plaintiff's counsel would put upon it. It would then apply at large to all actions for damages for personal injuries by an employee suffered in the line of duty, if based upon a want of ordinary care. The use of the word "damages," whereas recoveries under Workmen's Compensation Act are usually designated "compensation," and are so referred to in the Act, is pointed out. Likewise, they show us that "negligence," or "want of ordinary care" are factors of no importance in an action for workmen's compensation. Hence, counsel conclude:

"We submit this section of the statute means just what it says and what anyone with any training in the law understands it to mean, and that is that in an action of tort, brought by an employee or his representative for injury or death sustained while in the line of duty, by reason of the negligence of the employer, the defenses of contributory negligence, negligence of a fellow servant, or assumption of risk are not available."

This line of argument is very intriguing and even persuasive. It might be accepted but for the fact that it is overcome by other compelling considerations. In the first place, we are not permitted to consider this particular section apart from the context in which it is found. Indeed, the very section relied upon, in the concluding paragraph thereof, establishes indubitably that it refers to "compensation"

as provided for in the "Workmen's Compensation Act." Hence, if another plausible reason for presence in the Act of this particular section is to be found, and we shall demonstrate later there is such a reason, then we must reject the construction plaintiff would have us accept.

We have never had occasion to construe this section of the Act, or, perhaps better said, we have not heretofore found it necessary to do so. However, in Sena v. Sanders, 54 N.M. 83, 214 P.2d 226, the statute was invoked by defendants, and passed for consideration by us because we found the three defenses mentioned in it had not been pleaded below. In the case at bar, however, the defenses proscribed by the statute, if applicable, were pleaded below and set up as separate grounds, among others, of the motion for directed verdict, interposed by defendants when the plaintiff rested his case. The matter being thus squarely presented, we are neither disposed nor privileged to postpone a decision.

While counsel for plaintiff speak of the section as if first introduced into the Act by L.1937, c. 92, § 3, even with the adoption of the first Workmen's Compensation Act, L.1917, c. 83, § 6, we find a provision very similar to this one, as in the case also with the second enactment by L.1929, c. 113, § 6. In these two Acts, the section mentioned reads, as follows:

"Sec. 6. No employer in any case which would otherwise be governed by the provisions of this act who shall have elected not to be bound by this act, shall, in case of any suit against him for damages on account of injury suffered by accident or arising out of and in course of employment of such workman be entitled to defend the same on account (a) of the negligence of such workman having contributed to the injury; (b) that the injury was caused by the negligence of a fellow servant; (c) that the workman had assumed the risk inherent in or incidental to such employment or business, or arising from the failure of the employer to provide safe premises and suitable appliances; which defenses are in all such cases abolished; *Provided*, that such defenses shall remain only in cases where the workman is not bound by the provisions of this act and the employer has filed the undertaking or certificate required by section three hereof."

It could scarcely be contended for these sections as they appeared in the 1917 and 1929 Act that they carry the meaning contended for by the plaintiff. They are to be read in *pari materia* with the same section as it appears in the 1937 Act, 1953 Comp. § 59–10–5. We are inclined to agree with the construction advanced by counsel for defendant when they say:

"*Section 57–905* of the act provides substantially that the defenses of contributory negligence and assumed risk are not available in an action for personal injury sustained by an employee while in the line of his duty. It is the position of the defendant-Appellee in this case that Section 57–905 only applies to those employers subject to the provisions of the act by reason of the fact that they are engaged in an extra-hazardous occupation covered by the act. It is intended and designed to apply in those cases of employers subject to the provisions of the act who have rejected its provisions and have not complied with the requirements of the act with respect to insurance."

It seems clear to us that the questioned section can have no application to an occupation that is excepted from the Act. We have held it does not apply to employers of farm and ranch labor. Koger v. A. T. Woods, Inc., 38 N.M. 241, 31 P.2d 255. The statute, 1953 Comp. § 59–10–4, expressly excepts from its provisions certain employers. It reads:

"This act shall not apply to employers of private domestic servants or of farm and ranch laborers."

Decided cases under similar provisions in the Workmen's Compensation laws of other states support the conclusions we have reached on this subject. See 58 A.J.

607, § 46 (Workmen's Compensation). Page v. New York Realty Co., 59 Mont. 305, 196 P. 871; Hoffman v. Broadway Hazelwood, 139 Or. 519, 10 P.2d 349, 11 P.2d 814, 83 A.L.R. 1008; Palmer v. Inhabitants of Town of Sumner, 133 Me. 337, 177 A. 711, 97 A.L.R. 1292; Armburg v. Boston & Maine R. Co., 276 Mass. 418, 177 N.E. 665, 80 A.L.R. 1408; Price v. Railway Express Agency, 322 Mass. 476, 78 N.E.2d 13; Morris v. Timmer, 243 Mich. 512, 220 N.W. 794; Dietz v. Big Muddy Coal & Iron Co., 263 Ill. 480, 105 N.E. 289.

Having concluded that the defendants are not barred by the questioned language of the Workmen's Compensation Act from relying on the common law defenses of contributory negligence and assumed risk, the question remains whether under the evidence as it stood when the plaintiff rested, the trial court erred in taking the case from the jury and directing a verdict for the defendants. We think it did. It is well established, as counsel for the plaintiff remind us, citing a wealth of New Mexico decisions to sustain them, that in ruling upon a motion of this kind the evidence must be viewed in the light most favorable to the plaintiff, indulging in his favor every legitimate inference that may be drawn therefrom and ignoring conflicts in the evidence unfavorable to him. Hepp v. Quickel Auto & Supply Co., 37 N.M.

525, 25 P.2d 197; Sandoval County Board of Education v. Young, 43 N.M. 397, 94 P.2d 508; Mesich v. Board of Commissioners of McKinley County, 46 N.M. 412, 129 P.2d 974; Michelson v. House, 54 N.M. 197, 218 P.2d 861; Miera v. George, 55 N.M. 535, 237 P.2d 102.

So viewed, let us see if the trial court was warranted in ruling upon all issues interposed as a defense, as a matter of law, and denying the jury an opportunity to pass its judgment on the facts. We shall spend little time on the question of primary negligence on defendants' part. Certainly, they were obligated to furnish the plaintiff a reasonably safe place to perform the duties of the particular task on which he was engaged. We do not hesitate to give it as our opinion that it was for the jury to say whether the loblolly surrounding the hammermill and extending over the loose, uneven boards constituting plaintiff's base of operations was a reasonably safe place to work.

If the jury should find it was not, then the further question, did the plaintiff assume the risk incident to working there and was he contributorily negligent in doing so? These questions are to be answered by us, provisionally only, and not in any sense as a finding, but merely to announce whether we think there was enough evidence to permit the jury to make a finding as respects each of them, if it so chose. In our opinion, the trial court erred in declining to permit the jury to pass upon primary negligence of the defendants.

Whether the court erred in declaring as a matter of law that plaintiff assumed the risks incident to working under the conditions he did and in further ruling, as a matter of law, that he was contributorily negligent in so doing, are queries presenting closer questions than that of defendants' primary negligence. After full consideration, however, we are constrained to hold that, under the situation here disclosed, it was the peculiar province of the jury to sift, weigh and find whether the plaintiff, under all the circumstances, assumed the risk to which he was exposed and was contributorily negligent in so doing.

One can not read the plaintiff's testimony and fail to be impressed by his complete frankness and sincerity in answering every question put to him. He was an unlettered man, having very little education. It was, no doubt, a recognition on his part of his shortcoming in this behalf that had accustomed him to performing whatever duties were assigned him, without complaint, and without asking questions. Note the frank answer as to his appreciation of danger from the blades when he replied that practically the only way one could get hurt by the whirling blades was to have his arm thrust down the shaft "by falling into it."

Here, however, is the significance of that answer, or might have been, had the jury been permitted to consider it. That is the precise thing that did happen. Wearing heavy, slick overshoes to protect his feet from the mud and slime, when he crossed to the opposite side of the low board platform to keep the dust and chaff from blowing in his face from a strong wind, he, literally, did what he said was the only way he could get his hand cut by the blades, he "fell into the machine." Remote likelihood that he would suffer the very mishap that befell him was a factor which a jury might give considerable weight in deciding whether the plaintiff assumed the risks, whatever they were, of working under the conditions he did, and whether he was contributorily negligent in doing so. We think it was a question for the jury, one on which under the evidence different opinions might not unreasonably be formed, as to whether as a matter of fact the plaintiff did actually assume the risk of working where he did and under the conditions he did at the time of suffering the injury which befell him. Singer v. Swartz, 22 N. M. 84, 159 P. 745; Leyba v. Albuquerque & Cerrillos Coal Co., 22 N.M. 455, 164 P. 823; Maestas v. Alameda Cattle Co., 36 N.M. 323, 14 P.2d 733.

The cases of Singer v. Swartz and Maestas v. Alameda Cattle Co., supra, are not unlike the present in that both were common law actions for damages for injuries to a hand suffered in a machine and assumption of risk was relied upon as one of the defenses. In the Singer case, the court said [22 N.M. 84, 159 P. 748]:

"Whether as a matter of law the risk was assumed depends entirely on the facts of each case, and therefore precedent is of little avail. In the case at bar we cannot say that this 13 year old girl should have comprehended the extraordinary risk caused by the negligence of the master in failing to properly adjust the safety roller. We cannot say that the evidence shows that she was more intelligent than any other girl or boy of the same age. Certainly it appears that she did not possess the understanding of an ordinarily prudent adult person. But in view of the fact that the evidence is in such a state that different opinions may not unreasonably be drawn from it as to whether the servant knew and comprehended the extraordinary risk, we believe the court committed no error in submitting the case to the jury."

Again, in the Maestas case, the court held the issue was properly to be submitted to the jury. There, as here, the injury was to the hand of the plaintiff and there, as here, the injury to his hand in a machine resulted when plaintiff [36 N.M. 323, 14 P.2d 735] "was struck by a gust of wind * * * and made to slip on the floor, and stumble against the unguarded, uncovered

and unprotected \* \* \* pump jack." Quoting approvingly from Crawford v. Western Clay & Gypsum Products Co., 20 N.M. 555, 151 P. 238, this excerpt, to-wit:

"'Whether the deceased knew and appreciated the danger and nevertheless performed the service, or whether the conditions were such that he, as an ordinarily prudent man, must have known the danger, is a matter of fact about which minds of men might differ, and the question was for the jury.'"

we held the question of assumed risk was one for the jury. As to the immediate occasion of the injury, the court, in an opinion on motion for rehearing, said:

"The circumstance of a servant stumbling into dangerous machinery in the course of his employment is so common an experience and of such frequent occurrence, and accordingly so probable, that it seems to us that the risk of it must be in the mind of a prudent person charged with the legal duties of master."

There is a peculiar situation existing in this case touching the defense of assumed risk. Once it is accepted as an established fact that there was primary negligence on the part of defendants in the failure to provide a reasonably safe place for plaintiff to work, all argument to the contrary by defendants designed to absolve them from negligence, a want of due care, merely tends to emphasize the issuable character of the defenses mentioned before a jury.

We feel much the same way about the defense of contributory negligence as a jury question as we do about that of assumed risk. Indeed, much of what has been said as to issuable character before the jury of the defense of assumed risk applies with equal force in the case of contributory negligence. Ordinarily, contributory negligence is for the jury to decide as a facts question. Maestas v. Alameda Cattle Co., supra; Olguin v. Thygesen, 47 N.M. 377, 143 P.2d 585; Lucero v. Harshey, 50 N.M. 1, 165 P.2d 587. So it is here. Truly, reasonable minds could readily form opposite opinions on whether the negligence, if any, on plaintiff's part contributed proximately to cause the injury he suffered. Such being the case, the trial court should have permitted the case to go to the jury.

It follows from what has been said that the judgment of the district court should be reversed and the cause remanded with a direction that the judgment reviewed be set aside and a new trial granted unto plaintiff, who shall recover costs of this appeal.

It is so ordered.

COMPTON, C. J., and LUJAN and KIKER, JJ., concur.

McGHEE, Justice (dissenting).

I dissent from that portion of the majority opinion holding the trial court erred in directing a verdict for the defendants.

Without question, according to the testimony of the plaintiff himself, he knew and appreciated all of the hazards and dangerous conditions present at the feed grinder; he made no complaint to the employer, and could not say for sure the employer actually knew of the dangers and defective condition of the platform; but I say the employer must have known of them. The platform on which the hammermill rested was patched and rough. When asked why he did not repair the platform, the plaintiff answered that the employer did not say fix the platform, he said grind the feed.

I class the risk in this case as an extraordinary one; that is, one created or allowed to exist by the employer, and there is no question the employer did not furnish the servant a safe place to work.

The majority opinion cites the case of Singer v. Swartz, 1916, 22 N.M. 84, 159 P. 745, 747, for support. That was a laundry mangle case where the safety guard was not properly adjusted and the thirteen year old girl who had worked on the mangle only a few days testified she did not know it was improperly adjusted. In that case it is stated:

"* * * There is no presumption that a servant knows and appreciates the extraordinary risks of the service (3 Labatt's Master & Servant, § 1201), unless, perchance, the circumstances are such as to charge her with full knowledge thereof, in which event the question becomes one of law, rather than fact. 2 Bailey, Per. Inj. § 388. * * *"

This case, in my opinion, is strong authority for the action of the court in directing a verdict here, in view of the testimony of the plaintiff that he knew and appreciated all dangers.

We said only recently in Jones v. Adams, 1952, 56 N.M. 510, 245 P.2d 843, 844, in quoting approvingly from Van Kirk v. Butler, 1914, 19 N.M. 597, 145 P. 129, where we in turn quoted approvingly from Labatt's Master & Servant, § 1186a:

"' "The servant assumes all the ordinary risks of the service and all of the extraordinary risks—i. e., those due to the master's negligence—of which he knows and the dangers of which he appreciates."

"' 'This is a comprehensive statement of the rule which thus qualified the general rule that it is the duty of the master to provide a reasonably safe place for the servant to work.' "

In the Van Kirk case it is said [19 N.M. 597, 145 P. 133]:

"It is our conclusion that the state of facts here presented for our con-

sideration did not constitute an ordinary risk, but rather an extraordinary one, resulting from the negligence of the owner and master, and, as the case is now presented to us, *it does not appear that the servant knew of the condition*, and therefore assumed the risk, for which reason we necessarily conclude that the trial court was in error in directing a verdict for the defendant, * * *." (My emphasis.)

In Thayer v. Denver & R. G. R. Co., 1916, 21 N.M. 330, 363, 154 P. 691, 701, it is stated:

"Labatt's Master and Servant, § 1186a, summarizes the rule as to the assumption of risk in the following language:

" 'The servant assumes all the ordinary risk of the service, and all of the extraordinary risk; that is, those due to the master's negligence of which he knows and the dangers of which he appreciates.' "

The opinion goes on to say the plaintiff was employed as a laborer icing cars and he was not a brakeman; that it could not be contended with any degree of logic that he assumed the risk of a defective brake shoe on the car he was told to ride down the track and set the brakes on, unless it appeared he was an experienced brakeman.

In the case under consideration the plaintiff testified he had had long experience grinding feed in a hammermill; that he knew the muddy condition around the mill had existed for a considerable period of time; that he also knew his overshoes were muddy and slick; that the platform was rough and patched; and that he knew the knives in the mill were unguarded and dangerous.

"One who knows of a danger from the negligence of another, and understands and appreciates the risk therefrom, and voluntarily exposes himself to it, is precluded from recovering for an injury which results from the exposure." Fitzgerald v. Connecticut River Paper Co., 1891, 155 Mass. 155, 29 N.E. 464, 465. See also: O'Maley v. South Boston Gas Light Co., 1893, 158 Mass. 135, 32 N.E. 1119, 47 L.R.A. 161; Indiana Nat. Gas & Oil Co. v. O'Brien, 1903, 160 Ind. 266, 65 N.E. 918, 66 N.E. 742.

In 2 Shearman and Redfield on Negligence (Rev.Ed., 1941), § 231, it is said:

"A servant who, with actual or constructive notice of a defect, due to the master's fault, and of the danger to which he is exposed thereby, and either fully comprehending the risk, or by his own fault failing to do so 'voluntarily takes his chance' and continues in work which exposes him to such danger, without reasonable excuse and without complaint or objection, though ordinary prudence might require him

to refuse the risk, is held to assume the risk."

Generally the question of contributory negligence should be submitted to the jury, but more often than not the question of assumption of risk is a matter of law, as shown by the following quotation from 2 Shearman and Redfield, op. cit. supra, at § 229:

"The better opinion would seem to be that the servant's assumption of risks caused by the master's negligence is solely referable to the maxim *volenti non fit injuria*. The application by the court of this defense so as effectually to defeat the servant's action for personal injuries often becomes a matter of law, while, on the other hand, the defense of contributory negligence must generally be submitted to the jury. The principle is, of course, the same in both classes of cases, viz.: that the defense should be submitted to the jury unless the fact of contributory negligence or assumption of risk is so clear upon the evidence that reasonable minds cannot differ. But it is readily seen that in the case of an experienced employee where the fact of his knowledge of the defect is established beyond question, it must often occur that his appreciation of the risk and voluntary acceptance of it will be equally apparent;

in such case his assumption of the risk becomes a peremptory inference of law. * * *"

All of the testimony on the points here discussed came from the lips of the plaintiff.

The majority opinion also relies on the case of Maestas v. Alameda Cattle Co., 1932, 36 N.M. 323, 14 P.2d 733, for support.

As I analyze that case the facts are materially different there and here and its rationale supports the action of the trial court. There the servant was attempting to oil an unguarded pump jack with an ordinary tomato can instead of an oil can with a long neck. There was a gust of wind when the servant got his hand in the cog wheels, but there the similarity of the cases ends. In that case the servant was inexperienced and had poor eyesight; he had complained of the lack of a guard and the employer had promised to equip the pump with a guard to protect the plaintiff from the cog wheels, but had not done so— the foreman had told the servant he need not be afraid, to continue work and he, the foreman, would fix it right away.

I believe admiration for Thompson because he told the truth on the witness stand has caused a majority to see jury questions on the assumed risk and contributory negligence issues where none in fact exist; therefore, I dissent.